The STATE of Oklahoma ex rel. Michael C. TURPEN, Attorney General, Appellant,

v.

The OKLAHOMA STATE BOARD for PROPERTY AND CASUALTY RATES and the National Council on Compensation Insurance, a rating organization, Appellees.

The NATIONAL COUNCIL ON COMPENSATION INSURANCE, a rating organization, Appellant,

v.

The OKLAHOMA STATE BOARD FOR PROPERTY AND CASUALTY RATES, Appellees.

Nos. 65430, 65423.

Supreme Court of Oklahoma.

July 24, 1986.

As Corrected Aug. 12, 1986.

Rehearings Denied Feb. 3, 1987.

---

15. Supra, note 4.

16. See *Rogers v. Sheppard,* 200 Okl. 203, 192 P.2d 643 (1948); *Davenport v. Doyle,* 57 Okl. 341, 157 P. 110 (1916).

396

Michael C. Turpen, Atty. Gen., Susan Brimer Loving, Victor N. Bird, Asst. Attys. Gen., Oklahoma City, for appellant State of Okl. ex rel. Michael C. Turpen, Atty. Gen.

J. Angela Ables, Kerr, Irvine & Rhodes, Oklahoma City, for appellee Okl. State Bd. for Property and Cas. Rates.

Larry Derryberry, Derryberry, Parrish, Gooding & McMahan, Oklahoma City, for appellant Nat. Council on Compensation Ins.

OPALA, Justice.

The issues dispositive of the two appeals are: [1] Did the rate filing of the National Council on Compensation Insurance [NCCI] automatically become effective by operation of 36 O.S.1981 § 902(G) before the

State Board for Property and Casualty Rates [Board] issued its order adjudicating the filing? [2] Are the Board's findings of fact and conclusions of law sufficient to support its order approving the rate filing as modified? [3] Did the Board's order lack evidentiary support? To the first and second questions we give a negative answer, to the third, an affirmative one.

On behalf of its members and subscribers who are presently writing or will write workers' compensation insurance in Oklahoma, NCCI filed an application with the Board seeking approval of a 41.9 percent increase in premium rates through specified rate changes in classifications of workers' compensation insurance.[1] At the Board's August 29, 1985 meeting the Attorney General formally appeared on behalf of the State.[2] The Board continued the hearing on NCCI's rate filing until October 2, 1985. On September 10, 1985 the Attorney General submitted a written request to the Board for NCCI's production of data and accompanying documents. On the same date, the Board ordered NCCI to respond to the Attorney's General request on or before September 20, 1985. NCCI's September 17, 1985 response indicated that a substantial portion of the information sought was not available, because it covered "internal information" not provided to NCCI by its member companies. After the

hearing the Board approved NCCI's rate filing but reduced the requested 41.9 percent rate increase to 25.9 percent. From this determination both the Attorney General and NCCI brought separate appeals which stand consolidated for our decision.[3]

The Attorney General contends that [1] the Board's order should be reversed because it contains insufficient findings of fact and conclusions of law and [2] there was error in approving NCCI's rate filing, as modified, because, contrary to 36 O.S. 1981 § 902(B),[4] the Board had failed to compel the production of actual investment income and expense data and hence did not consider these items in its assessment. In short, the Attorney General urges that, as a matter of law, the Board acted upon *insufficient* evidence of the financial condition of the private insurance carriers represented by NCCI.

NCCI argues that, while it believes the order is not facially infirm, the Board's findings and conclusions are wrong because [1] its rate filing had become automatically effective by operation of law, [2] the evidence the Board relied upon is insufficient to support its order and [3] the evidence tending to support NCCI's rate structure destroys the probative value of the evidence relied upon by the Board. Both NCCI and the Board argue that [1] 36

---

1. NCCI is a licensed rating organization, as defined by 36 O.S.1981 § 928, and is authorized to file insurance rates for approximately 125 insurers writing workers' compensation insurance in Oklahoma. See the provisions of 36 O.S.1981 § 903 requiring every insurer, either directly or through a licensed rating organization, to file with the Board all rates, rating plans and classifications which its members and subscribers use or propose to use in this state, *infra* note 23.

2. The Attorney General is authorized to represent the public interest in the proceedings held by the Board. 36 O.S.Supp.1982 § 903(D), *infra* note 23.
 The Attorney General formally appeared pursuant to the request of the Governor, the President Pro Tempore of the Senate, and the Speaker of the House of Representatives. 74 O.S.Supp. 1982 § 18b(c). The terms of § 18b(c) provide: "The duties of the Attorney General as the chief law officer of the state shall be:
 \* \* \* \* \* \*

(c) To appear at the request of the Governor, the Legislature, or either branch thereof, and prosecute and defend in any court or before any commission, board or officers any cause or proceeding, civil or criminal, in which the state may be a party or interested; and when so appearing in any such cause or proceeding, he may, if he deems it advisable and to the best interest of the state, take and assume control of the prosecution or defense of the state's interest therein."

3. The absence of critical data was raised by the Attorney General during the proceedings and by written objection filed the day the hearing began. These timely objections preserved for appellate review the contested legal sufficiency of NCCI's filing to support *any* rate change. *State ex rel. Cartwright v. Oklahoma Natural Gas Company,* Okl., 640 P.2d 1341, 1345 [1982].

4. For the terms of 36 O.S.1981 § 902(B), see text in Part III of this opinion.

O.S.1981 § 337 [5] is controlling with respect to the legal sufficiency of the order's content and [2] the order conforms to that section's requirements.

## I

### NCCI'S RATE FILING DID NOT AUTOMATICALLY BECOME EFFECTIVE BY FORCE OF 36 O.S.1981 § 902(G)

NCCI asserts that, pursuant to the terms of 36 O.S.1981 § 902(G), its rate filing became *automatically effective* after the expiration of the 30–day waiting period prescribed in that section. The terms of § 902(G) provide in pertinent part:

"Any filing made in accordance with the provisions of Section 903 of this article shall be on file for a waiting period of thirty (30) days before it becomes effective, which period may be extended by the Board for an additional period *not to exceed fifteen (15) days* if it gives written notice.... *A filing shall be deemed to meet the requirements of this article unless disapproved by the Board within the waiting period or any extension thereof.* * * * " [Emphasis added.]

NCCI also argues that the terms of 36 O.S.1981 § 332(B),[6] which authorize the Board to *modify* a rate filing, are also subject to the time limit provided in § 902(G). The thrust of NCCI's argument is that the statutory authorization for "any extension" of the waiting period is limited to the single 15–day enlargement specifically prescribed in § 902(G). Acting in the discharge of our constitutional responsibility to effectuate legislative intent within the bounds of minimum standards of due process, we must disagree.

An essential component of the statutory scheme for rate filing is its investigative process. It may be initiated by the Board [7] or by "any person or organization aggrieved." [8] The terms of 36 O.S.1981 § 345(B) provide in part that any person affected by the hearing shall be given "... a reasonable opportunity to inspect all documentary evidence, to examine witnesses, to present evidence in support of his interest, and to have subpoenas issued by the Board to compel attendance of witnesses and production of evidence in his behalf. * * * " Sections 902 and 903 [9] address not only the insurer's duties in rate filing but also the Board's responsibility to investigate the soundness of rates when, from its own information or from the complaint of an aggrieved party, it is made to appear that tendered rates are not conformable to the statutory standards. From an analysis of these sections it is obvious that the legislature intended to provide a framework for an *adversary adjudicative process* during agency hearings on rate filings.

When a statute is susceptible to more than one construction, it must be

---

5. See *infra* note 14 for the pertinent text of 36 O.S.1981 § 337.

6. See footnote 7, *infra*.

7. 36 O.S.1981 § 332. The relevant terms of § 332 are:

"* * * * * *

B. The Board shall have powers and authority expressly conferred upon it by or reasonably implied from the provisions of this Code. The Board shall have the power to approve, disapprove, or approve with modifications, filings submitted to it.

C. The Board may conduct such examinations and investigations of insurance matters, within the scope of its authority, as it may deem proper to secure information useful in the lawful administration of any such provision.

D. The Administrator shall have the authority and power, subject to approval of the Board, to employ actuaries, statisticians, accountants, attorneys, auditors, investigators or any other technicians as the Administrator or the Board may deem necessary or beneficial to examine any filings for rate increases made by insurers or rating organizations and to examine such records of the insurers or rating organizations as they may deem appropriate in conjunction with the filing for a rate increase in order to determine that the rates or other filings are consistent with the terms, conditions, requirements and purposes of the Insurance Code, and to verify, validate and investigate the information upon which the insurer or rating organization relies to support such filing. All rate filings, except those provided in subsection F of Section 18 of this act, shall be subject to approval of the Board. * * *"

8. See, 36 O.S.Supp.1982 § 903(D), *infra* note 23.

9. See footnote 23, *infra*.

given an interpretation that frees it from constitutional doubt rather than one which would make it fraught with fundamental-law infirmities.[10] Whether the Board was authorized to extend the time for consideration of the rate filing beyond the statutory 30–day period can only be determined by construing the critical phrase in § 902(G)— "any extension thereof"—in light of legislative intent expressed in §§ 903, 332 and 345. The cited sections clearly indicate that the legislature intended to afford the Board, or any aggrieved person, the opportunity for an investigation of a rate filing.[11] The language, "any extension thereof," must hence be construed to encompass those circumstances in which, as here, the Board is actively investigating and conducting hearings during the statutory waiting period. Once the intent of the legislature appears clear from a consideration of the total enactment, language may be altered and new words supplied to give it that meaning which is necessary fully to effectuate the objective of the lawmaking body.[12]

■ The Attorney General formally appeared and subsequently made an extensive data-production request. By these acts the investigative process came to be triggered and was underway. We therefore conclude that the § 902(G) provisions for *automatic effectiveness* do not apply to NCCI's rate filing here under review.[13] To view this section otherwise would deprive an aggrieved person of express *statutory* rights; it would also contravene the underlying purpose of the legislative scheme. Today's construction will best assure the preservation of fundamental due process in the investigative stage of the proceedings.

## II

## THE BOARD'S ORDER LACKS REQUISITE FINDINGS OF FACT

■ The Board and NCCI contend that 36 O.S.1981 § 337[14] controls the form of the Board's order, and that no specific findings of fact need be included. We disagree. Another and more specific statute must govern here because the order under review resulted from a hearing. The terms of 36 O.S.1981 § 346(B)[15] provide in pertinent part:

---

**10.** *Ricks Exploration Company v. Oklahoma Water Resources Board,* Okl., 695 P.2d 498, 504 [1985]; *Neumann v. Tax Commission,* Okl., 596 P.2d 530, 532 [1979] and *Wilson v. Foster,* Okl., 595 P.2d 1329, 1333 [1979].

**11.** Legislative concern that interested persons be given notification of workers' compensation rate filings is reflected in the 1982 amendment of § 903 A [Okl.Sess.L.1982, Ch. 59 § 1], which requires the Board to send notification to any person who requests, in writing, to be notified of any workers' compensation rate filings pursuant to Board regulation. To protect the integrity of the agency investigative process, criminal penalties may be imposed against those who knowingly file fraudulent or materially false statements [36 O.S.Supp.1983 § 909] or violate any provisions of 36 O.S.1981 §§ 901 et seq. [36 O.S.Supp.1983 § 909]. See 36 O.S.1981 § 904(D), which provides that "[n]o insurer, agent, broker, or rating organization may wilfully withhold required information from or give false or misleading information to the Board."

**12.** *WRG Construction Company v. Hoebel,* Okl., 600 P.2d 334, 337 [1979], citing *Protest of Chicago R.I. & P. Ry. Co.,* 137 Okl. 186, 279 P. 319 [1929].

**13.** The Board's order that NCCI respond to the Attorney's General written data-production request sufficiently met the notice requirement in § 902(G).

**14.** Under the heading of "Orders, notices" the terms of 36 O.S.1981 § 337 provide in pertinent part:
"A. Orders and notices of the Board shall not be effective unless in writing signed by it or by the Administrator when authorized by the Board.
B. Every such order shall state its effective date and shall concisely state:
 1. Its intent or purpose.
 2. The grounds on which based.
 * * *"

**15.** The remaining provisions of 36 O.S.1981 § 346, not quoted in the text of this opinion, are:
"A. In conducting any such hearing the Board shall sit as a quasi-judicial body. Within thirty (30) days after termination of the hearing or of any rehearing thereof or reargument thereon, it shall make its order on hearing, covering matters involved in such hearing and in any rehearing or reargument thereof, and shall give a copy of such order to the same persons given notice of the hearing.

*" \* \* \**

B. The order shall contain a concise statement of the facts as found by the Board, a concise statement of its conclusions therefrom, and the effective date of the order.

\* \* \*"

■ The findings of an agency acting in its adjudicative capacity must [1] recite the underlying facts that support the ultimate facts drawn from the evidence, [2] be free from ambiguity which raises doubt as to

\*　　\*　　\*　　\*　　\*　　\*

C. The order may affirm, modify, or nullify action theretofore taken or may constitute the taking of new action within the scope of the notice of hearing."

16. *Allstate Insurance Company v. State Board for Property and Casualty Rates,* Okl., 408 P.2d 329, 330 [1965] and *Oklahoma Inspection Bureau v. State Board for Property and Casualty Rates,* Okl., 406 P.2d 453, 454 [1965].

17. *Oklahoma Inspection Bureau v. State Board for Property and Casualty Rates, supra* note 16 at 454.

18. The Board's findings are:

*" \* \* \**

#### FINDINGS OF FACT

1. That on or about the 1st day of July, 1985, the NCCI, a rating organization as defined by 36 O.S.Supp.1984, § 928, made a filing with the State Board seeking an average forty-one and nine-tenths percent (41.9%) rate increase through specified rate changes in the classification on workers compensation insurance written in the State of Oklahoma. That on or about the 2nd day of August, 1985, the State Board requested additional information concerning the filing. This additional information was provided by the NCCI on or about the 12th day of August, 1985.

2. That on or about the 23rd day of August, 1985, the Attorney General of the State of Oklahoma (Attorney General) filed a Petition for Intervention and Motion for Continuance in the State Board's hearing on the NCCI rate filing. The State Board allowed the intervention and granted the Attorney General a continuance.

3. That on or about the 17th day of September, 1985, Mr. Julius E. Kubier (Kubier), President of Associated Industries of Oklahoma, filed a Petition for Intervention on behalf of Associated Industries of Oklahoma, the State Chamber of Commerce and the Oklahoma Lumbermen's Association. The State Board allowed the intervention.

4. That the State Board retained E. James Stergiou as an outside expert actuary to review and analyze the rate filing made by the NCCI;

whether the Board proceeded on the correct legal theory and [3] be sufficiently specific to enable a reviewing court to ascertain whether the ultimate facts upon which the decision is rested afford a reasonable basis for the order.[16] These requirements constitute a *sine qua non* of the decision's validity and, where an agency fails to make adequate findings of fact, its determination cannot be affirmed.[17]

■ On review of the Board's findings [18] and conclusions [19] we are constrained to

that the Attorney General retained Allen Schwartz and John Robert Hunter as outside expert actuaries and Dr. John Wilson as an outside economist to review the rate filing made by the NCCI; and that the Associated Industries of Oklahoma, the State Chamber of Commerce and the Oklahoma Lumbermen's Association retained Julius E. Kubier to make statements and present evidence regarding the rate filing made by the NCCI.

5. That E. James Stergiou testified that based upon his independent review, a rate increase of twenty-five and nine-tenths percent (25.9%) was indicated.

6. That Allen Schwartz, John Robert Hunter and John Wilson testified that based upon their independent review, recognition of investment income alone would reduce the indicated rate change to eight and one-tenths percent (8.1%), but, that failure of the NCCI to provide detailed expense records should result in no increase being granted at all.

7. That Julius E. Kubier presented evidence that based upon his independent review, a rate increase of fifteen and two-tenths percent (15.2%) was indicated.

8. That the NCCI testified through Anthony John Grippa, its actuary, and David Appel, its economist, that an average increase of forty-one and nine-tenths percent (41.9%) was indicated through changes in rates per classification.

9. That the insurance industry has suffered substantial losses in Oklahoma on their workers compensation coverages thereby creating a potential threat to the solvency of some insurers providing this coverage; and, that without rate relief, the insurance industry doing business in this State will constrict their writing thereby reducing the market availability of workers compensation insurance in Oklahoma.

10. That the State Board adopts and accepts the rate calculations of Mr. E. James Sturgiou [sic] as set forth in his reports (attached hereto and incorporated herein as Exhibits A and B). That the Sturgiou [sic] recommendations are fair and reasonable in establishing a rate which is neither excessive, inadequate nor discriminatory. That the Sturgiou [sic] recommendations

19. See note 19 on page 401.

hold that the order is infirm. Several of the findings are but mere assertions that relate to the testimony of various witnesses, while other findings simply give an account of procedural rather than of ultimate facts. Finding No. 10,[20] in which the Board adopts a mass of evidence presented by its expert witness, clearly lacks the specificity that is expected of a Board's order rendered upon a hearing. The remaining paragraphs of the order consist of conclusory statements that are unsupported by actual findings of fact.[21] We therefore hold that because the order lacks findings of fact upon which the Board could have based its conclusions of law, it is fatally deficient and must hence be vacated.

## III
## THE BOARD'S ORDER APPROVING THE RATE FILING AS MODIFIED LACKS EVIDENTIARY SUPPORT

The Attorney's General primary contention is that the Board erred by failing to compel the production of and hence to consider sufficient evidence about the financial condition of the insurers represented by NCCI. We agree. Our analysis begins with an overview of the pertinent statutes, 36 O.S.1981 §§ 901 et seq., which govern the Board's adjudicative ratemaking functions.

*Regulation* is the central tenor of the Insurance Code.[22] *Every insurer* is required to file with the Board, directly or through a licensed rating organization, *all* rates and rating plans which it uses or proposes to use in the state.[23] Rates in

have the effect of balancing the interests of policyholders, the insurance industry and the State in establishing a fair rate.

11. That the rate structure for workers compensation insurance in the State of Oklahoma bears a direct relationship to the benefits and the method of determining benefits as mandated under Oklahoma statutes and that in order to affect reductions in workers compensation rates, corresponding legislative changes in benefits and the method of determining benefits would be required."

19. The relevant portions of the Board's conclusions are:

"CONCLUSIONS OF LAW

That the rate filing on workers compensation rates made by the NCCI is adequate for full and complete deliberation by the State Board in determining the reasonableness of the proposed rate increase pursuant to 36 O.S.Supp.1984, § 902 and Rule and Regulation of the State Board for Property and Casualty Rates, 18(I)(5).

That the State Board gave due consideration to past and prospective loss experience within and outside the state, to physical hazards, to safety and loss prevention factors, to underwriting practice and judgment, to catastrophe hazards, if any, to a reasonable margin for underwriting profit and contingencies; to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members, or subscribers; to past and prospective expenses both country wide and those specially applicable to the state; to whether classification rates exist generally for the risks under consideration; to the rarity or pecu-

liar characteristics of the risk and to all other relevant factors within and outside the state including investment income from unearned premium and loss reserves, the impact of a rate increase on policyholders and the State's business climate, the availability of a market for workers compensation insurance and the solvency of the insurers providing workers compensation insurance, pursuant to 36 O.S.Supp. 1984, § 902.

That a rate increase of twenty-five and nine-tenths percent (25.9%) is not excessive, inadequate or unfairly discriminatory pursuant to 36 O.S.Supp.1984, § 902. * * * "

20. See footnote 18 *supra*.

21. The statement in Finding No. 9, *supra* note 18, that "the insurance industry has suffered substantial losses in Oklahoma" yields no factual basis for the Board's conclusion that a "potential threat to the solvency of some insurers" was created. The use of the term "losses" makes the finding ambiguous. Its meaning should have been explained. An insurer may have incurred "substantial losses" and still realized a net profit.

22. 36 O.S.1981 §§ 101 et seq.

23. The terms of 36 O.S.Supp.1982 § 903 provide:

"A. Every insurer shall file with the Board, either directly or through a licensed rating organization of which it is a member or subscriber, all rates and rating plans and classifications which it uses or proposes to use in this state. The Board shall send a notification of filing of rates to any person who requests,

existence can be challenged *by the Board sua sponte* or by any party aggrieved because of those rates. If "... it shall be made to appear to the Board ... that there are reasonable grounds to believe that the rates on any or on all risks ..." contravene the terms of 36 O.S.1981 §§ 901 et seq., then the Board is required to act upon its statutory duty to investigate and to determine whether the rates conform to Code requirements. 36 O.S.Supp.1982 § 903(B).

In addition to permitting a challenge to existing rates, the legislature has provided that *filings* may also be contested. The pertinent terms of § 903(D)[24] provide that "[a]ny person or organization aggrieved with respect to any filing ... may make written application to the Board for a hearing thereon." Whenever a hearing is held

"... for the purpose of determining whether a filing complies with the provisions of [36 O.S.1981 §§ 901 et seq.] ... *the burden of proof shall rest on the insurer or rating organization* which made such filing." [Emphasis added.] 36 O.S.Supp.1982 § 903(C).[25]

■ The statute's foremost mandate for ratemaking is that rates "... shall not be excessive, inadequate, or unfairly discriminatory."[26] When NCCI, by its filing, requested an *increase* in rates, it essentially asserted that the rates in effect at that time were *inadequate*. The third paragraph of § 902(A) explicitly governs how the Board determines whether rates are inadequate. It provides:

"No rate shall be held to be inadequate *unless* (1) such rate is unreasonably low

in writing, to be notified of any workers' compensation rate filings pursuant to regulation of the Board.

B. Whenever it shall be made to appear to the Board, either from its own information or from complaint of any party alleging to be aggrieved thereby, that there are reasonable grounds to believe that the rates on any or on all risks or classes of risks or kinds of insurance within the scope of this law are not in accordance with the terms of this law, it shall be the duty of the Board to investigate and determine whether or not any or all of such rates meet the requisites of Article 9 of this title.

C. After such an investigation of any such rates, the Board shall, before ordering the discontinuance of the use of such rates, hold a hearing upon not less than ten (10) days' written notice, specifying the matters to be considered at such hearing, to every insurer and rating organization which filed such rates. The Board need not hold such hearing if the Board is advised by every such insurer and rating organization that they do not desire such hearing. If after such hearing the Board determines that any or all of such rates are not in compliance with the provisions of Article 9 of this title, it shall issue an order, stating when, within a reasonable period thereafter, such rate or rates shall be deemed no longer in effect. Pending such investigation by the Board, rates shall be deemed to have been made in accordance with the terms of Article 9 of this title. In the event a hearing is held for the purpose of determining whether a filing complies with the provisions of Article 9 of this title, the burden of proof shall rest on the insurer or rating organization which made such filing.

D. Any person or organization aggrieved with respect to any filing made pursuant to Article 9 of this title may make written application to the Board for a hearing thereon. Such application shall specify the grounds to be relied upon by the applicant. If the Board shall find that the application is made in good faith and that the applicant would be so aggrieved if such grounds are established, it shall within thirty (30) days after receipt of such application hold a hearing upon not less than twenty (20) days' written notice to the applicant and to every insurer and rating organization which made such filing.

E. All meetings of the Board shall be formal public meetings and no official action shall be taken except at a formal public meeting where minutes of the proceedings are recorded and made a matter of public record. No final action on any matter involving rates shall be taken until not less than fifteen (15) days from the time of such meeting. Any conferences held prior to any meeting where final action is taken shall be official conferences with minutes of the proceedings to be recorded and made a matter of public record.

F. The Board is further empowered to investigate and to order removed, at such time and in such manner as it shall specify any unfair discrimination existing between individual risks or classes of risks."

24. See footnote 23 *supra* for the complete text of § 903(D).

25. See also *Standard National Insurance Company of Hartford, Connecticut v. State Board for Property and Casualty Rates,* Okl., 520 P.2d 672, 674 [1974].

26. 36 O.S. 1981 § 902(A).

for the insurance provided and (2) the continued use of such rate endangers the solvency of the insurer using the same, *or unless* (3) such rate is unreasonably low for the insurance provided and the use of such rate by the insurer using same has, or if continued will have, the effect of destroying competition or creating a monopoly." [Emphasis added.]

This quoted provision, whose basic standards must be read in the *disjunctive*, prescribes two distinct measuring gauges, *either* of which must be employed in determining whether rates are inadequate.[27] Hence, a conclusion that rates are inadequate necessarily depends upon a finding that (1) rates are unreasonably low—a factor common to both gauges, and (2) *either* the use of the rates endangers insurer solvency *or* the rates do or will adversely affect competition or create a monopoly.

■ It seems evident that NCCI elected to prove inadequacy of rates by attempting to establish that they (1) were unreasonably low and (2) endangered insurer solvency.[28] The Board, then, was required to determine whether NCCI had met its burden to establish these elements *after* giving due consideration to *all* of the factors prescribed by 36 O.S.1981 § 902(B). The terms of this subsection provide:

"B. Due consideration shall be given to past and prospective loss experience within and outside the state, to physical hazards, to safety and loss prevention factors, to underwriting practice and judgment, to catastrophe hazards, if any, to a reasonable margin for underwriting profit and contingencies; to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members, or subscribers; to past and prospective expenses both countrywide and those specially applicable to the state; to whether classification rates exist generally for the risks under consideration; to the rarity or peculiar characteristics of the risks; *and to all other relevant factors within and outside the state."* [Emphasis added.]

■ Upon examination of the record, we cannot conclude that NCCI tendered for the Board's consideration sufficient evidence about the actual financial condition of the insurers it represented to warrant a finding that the rates at the time of the filing were inadequate. Although the materials included in NCCI's filing contain numerous tables and exhibits, we have found no information from which the actual financial state of any NCCI member company may be reasonably ascertained. The financial data provided consist almost entirely of percentages computed from the application of various development factors. A few documents contain dollar figures without reference to the insurers to whom they pertain, and it is not apparent how the figures were determined. They may have been weighted averages of all NCCI companies or merely a total or average of ten major companies. In fact, NCCI admittedly excluded detailed data on investment income.[29] The necessity for disclosure of information on investment income becomes even more clear in light of the industry-rec-

---

**27.** The vice of the dissenting view is that it *combines,* and hence compresses into *one,* the two *independent* statutory measuring gauges. Limiting the Board to a single gauge, as does the dissent, not only misconstrues the statute but also contravenes a clearly-articulated legislative intent. Rates asserted to be inadequate are assessable by the use of either of the *two* distinct dimensions. For example, an insurer may seek to demonstrate the adverse effect of rates upon its own solvency; *alternatively,* it might be shown that the use of these rates could adversely affect competition among insurers.

**28.** If NCCI did intend to prove that use of the rates in existence at the time of filing had or will have had the effect of destroying competi-

tion or creating a monopoly, we have found no evidence sufficient to support such finding.

**29.** NCCI's Exhibit No. 1 included a memorandum entitled *Consideration of Investment Income,* in which NCCI states:

" * * * While we clearly recognize the importance of investment income to insurer profitability, we cannot endorse its inclusion in the ratemaking formula. For one thing, there is no generally accepted methodology that can be applied to the problem; rather, there are a host of alternative approaches, each predicated on a set of assumptions which may be of dubious validity. * * * "

ognized axiom that money is made from investments, not underwriting.[30]

The evidence is devoid of any itemization of expenses by account. The filing contains but a general classification of expenses, and those figures are unverifiable. Before an adequate evaluation can be made of the effect of rates on the solvency of insurers, the Board must consider detailed evidence about the NCCI member companies' expenses.[31]

■■■■ In order for the Board to have given "due consideration" to not only each item specified in § 902(B) but also to "all other relevant factors," specific data on NCCI companies should have been included in the filing. We have long held that one of the most important factors in determining whether rates are inadequate is the financial soundness of the insurer.[32] Evidence considered by the Board may include annual financial statements or other data forms from which net profit and dividends actually paid may be considered.[33] Among the other relevant factors that the Board must consider is income from unearned premium and loss reserves.[34] Because these reserves are in the nature of trust funds, income derived from them should inure to the benefit of policyholders and hence be considered by the Board.[35]

■■■ The terms of § 902(B) expressly require the Board to consider dividends. Indeed, the Board has the authority and the duty to protect policyholders from the potential harm that may result from a declaration of unlawful or excessive dividends.[36] While the record indicates that the Board did retain an actuary to assist in its evaluation of NCCI's filing, we note that the Board is empowered also to employ "statisticians, accountants, attorneys, auditors, investigators or any other technicians" as it or the Board's administrator may deem necessary for examining the rate filing.[37] The only evidence found in the record on dividends consists of ten figures which represent the Oklahoma percentage of dividends to earned premiums for the years 1975 through 1984. This evidence is both wholly insufficient and insubstantial. No disclosure was made of the identity of the companies to which the figures may have applied. Although dividends may be relevant when compared with earned premiums, they *must* be considered in the context of an insurance company's complete financial profile. The submission of specific data on dividends would seem to meet the express terms of the statute, but we believe that more is required for a meaningful consideration. Dividends are paid from net earnings, and, without actual, verifiable information on net earnings, the Board would be unable to ascertain if the dividends were excessive.[38]

The Attorney General also urges that there was insufficient evidence as to underwriting practices and judgments and as to safety and loss prevention factors. We agree. The record is devoid of specific, verifiable data for these items.

Mindful that effective regulation through adequate disclosure for the public benefit is the fundamental purpose of the Insurance Code, we hold that, because of

---

**30.** *Massachusetts Automobile Rating and Accident Prevention Bureau v. Commissioner of Insurance,* 384 Mass. 333, 424 N.E.2d 1127, 1135 [1981].

**31.** See *Associated Industries of Oklahoma v. State Insurance Board,* 173 Okl. 41, 46 P.2d 361, 366 [1935].

**32.** *Utilities Ins. Co. of Missouri v. State Ins. Board of Oklahoma,* 184 Okl. 234, 84 P.2d 619, 621 [1938].

**33.** *Utilities Ins. Co. of Missouri v. State Ins. Board of Oklahoma, supra* note 32.

**34.** *Oklahoma State AFL–CIO v. State Board for Property and Casualty Rates,* Okl., 463 P.2d 693, 696 [1970].

**35.** *Oklahoma State AFL–CIO v. State Board for Property and Casualty Rates, supra* note 34 at 695.

**36.** *General Ins. Co. of America v. State Ins. Board,* 189 Okl. 524, 118 P.2d 392, 394 [1941].

**37.** See, 36 O.S. 1981 § 332(D), *supra* note 7.

**38.** *General Ins. Co. of America v. State Ins. Board, supra* note 36 at 394.

critical evidentiary voids, the Board's approval of NCCI's rate filing, as modified, cannot be affirmed.[39] It hence follows that the 41.9 percent rate increase sought by NCCI also is lacking in requisite evidentiary support. Where the evidence fails to support a preliminary determination that existing rates are inadequate, the Board cannot validly approve any rate increase.[40]

 Since NCCI's filing is insufficient to support the 25.9% rate increase for workers' compensation insurance, the excess over the existing rate which has been collected by the affected insurers must be refunded. The Board shall prescribe the method for refunding premium overpayments. The order under review is vacated and the proceeding remanded to the Board with directions to proceed in a manner not inconsistent with this opinion.

ORDER VACATED AND PROCEEDING REMANDED.

SIMMS, C.J., DOOLIN, V.C.J., and HODGES, HARGRAVE and SUMMERS, JJ., concur.

LAVENDER, J., concurs in Parts I and II and dissents from Part III.

ALMA WILSON, J., concurring specially.

KAUGER, J., disqualified.

LAVENDER, Justice, concurring in part and dissenting in part:

I concur in parts I and II of the majority opinion for the reasons stated therein.

Part III of the opinion, however, appears to my view to have resulted from a misconstruction of 36 O.S.1981 § 902, which charges appellee Oklahoma State Board for Property and Casualty Rates with the duty of reviewing rate filings. I therefore must dissent to the majority opinion's treatment of the questions there involved.

The legislation in question, 36 O.S.1981 § 902, provides in subsection (A):

A. Rates for insurance shall not be excessive, inadequate, or unfairly discriminatory.

No rate shall be held to be excessive unless (1) such rate is unreasonably high for the insurance provided; or (2) a reasonable degree of competition does not exist in the area with respect to the classification to which such rate is applicable and such rate is unreasonably high for the insurance provided.

No rate shall be held to be inadequate unless (1) such rate is unreasonably low for the insurance provided and (2) the continued use of such rate endangers the solvency of the insurer using the same, or unless (3) such rate is unreasonably low for the insurance provided and the use of such rate by the insurer using same has, or if continued will have, the effect of destroying competition or creating a monopoly.

This section sets forth three grounds for rejecting a proposed or existing rate filing: one, if the rate is excessive; two, if the rate is inadequate; three, if the rate is unfairly discriminatory. In enacting this section the Legislature went on to set guidelines for the determination of when a rate filing is to be considered excessive or inadequate. These guidelines clearly set forth the Legislature's concern that competition be maintained in the industry and

---

**39.** The Board's extensive and protective duties also include close adherence to the statutory scheme in order to prevent the unjust enrichment of companies writing workers' compensation insurance in this state. *Associated Industries of Oklahoma v. State Insurance Board, supra* note 31 at 366. We note that insurance companies are engaged in a business impressed with a *public interest.* Because the Board is authorized to fix rates according to prescribed standards, its determination of the sufficiency of a rate filing is somewhat akin to ratemaking in public utility cases. See *Massachusetts Auto-*

*mobile Rating and Accident Prevention Bureau v. Commissioner of Insurance, supra* note 30; *Aetna Ins. Co. v. Travis,* 124 Kan. 350, 259 P. 1068, 1071–1072 [1927] and *American Alliance Ins. Co. v. Board of Ins. Com'rs.,* 126 S.W.2d 741, 744 [Tex.Civ.App.1939].

**40.** A motion to stay the effectiveness of the Board's order was filed by the Attorney General. The issues raised by that motion need not be addressed as they have been rendered moot by today's pronouncement.

that competition be the primary regulative mechanism for the industry.

The Legislature's intent is clearly gleaned from the language of the guidelines contained in section 902(A). The Legislature has stated that a rate is to be considered excessive *only* when it is unreasonably high. One of the factors foreseen as giving rise to unreasonably high rates is a lack of competition in the classification area. Similarly a rate is to be considered inadequate *only* when it is unreasonably low *and* as a result would endanger competition by threatening the solvency of the company offering the rate or of other companies in competition with the offering company.[1]

The majority opinion, however, has widely departed from the concept of allowing free market forces to govern proposed rates. From the statutory language quoted the majority has concluded that the adequacy of existing rates becomes an issue when a proposed rate filing is presented which would increase rates. The result of the majority's reasoning is to treat the insurance industry as a public utility. I find no authorization for such treatment in the statutes governing insurance.

It would appear that the majority opinion fails to address the question of whether the evidence before the Board would be sufficient to sustain a finding that the rate increase granted was not excessive. Instead the opinion addresses the question of whether the evidence was sufficient to sustain a finding that the previously existing rates were inadequate. My reading of the statutes would find this point beyond the scope of the Board's inquiry in this matter. For this reason I must dissent to part III of the majority opinion.

ALMA WILSON, Justice (concurring specially):

I fully concur with the disposition effected and the analysis supporting such disposition as set forth in the majority opinion;

and consistent with the majority opinion, on remand, the Oklahoma State Board For Property And Casualty Rates should request production or require the National Council On Compensation Insurance to show cause why the Attorney General's request of September 10, 1985 for data production should not be complied with. Findings and conclusions based on this data would appropriately implement 75 O.S. 1981, § 312 of the *Administrative Procedures Act*, which is in no way irreconcilable with 36 O.S.1981 § 345(B) as delineated by the majority opinion. Legislative acts are to be construed in such manner as to reconcile different provisions and render them consistent and harmonious and give intelligent effect to each. *Eason Oil Company v. Corporation Commission*, 535 P.2d 283 (Okl.1975). Unless a conflict between prior and subsequent enactments is irreconcilable, the earlier provision will not be repealed by the later enactment, and nothing short of irreconcilable conflict between statutes accomplishes a repeal by implication. *City of Sand Springs v. Department of Public Welfare*, 608 P.2d 1139 (Okl.1980).

---

1. See *Utilities Ins. Co. of Missouri v. State Ins. Bd. of Oklahoma*, 184 Okla. 234, 84 P.2d 619 (1938); *American Druggists Fire Ins. Co. of Cin-* *cinnati, Ohio v. State Ins. Bd. of Oklahoma*, 184 Okla. 66, 84 P.2d 614 (1938).