SHEET METAL CONTRACTORS OF IOWA; and National Federation of Independent Business, State of Iowa, Appellants,

v.

COMMISSIONER OF INSURANCE OF the STATE OF IOWA, Insurance Department of Iowa and the National Council on Compensation Insurance, Appellees.

No. 87–101.

Supreme Court of Iowa.

July 20, 1988.

Rehearing Denied Aug. 11, 1988.

I. John Rossi, Des Moines, and Dennis D. Hogan, West Des Moines, for appellants.

Thomas J. Miller, Atty. Gen., and Fred M. Haskins, Asst. Atty. Gen., for appellees Com'r of Ins. of Iowa and Ins. Dept. of Iowa.

Denny M. Dennis and David J. Lynch of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellee Nat. Council on Compensation Ins.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO, and ANDREASEN, JJ.

CARTER, Justice.

This appeal involves the April 1, 1986, order of the Iowa Commissioner of Insurance, approving a proposed increase in workers' compensation insurance premiums. After the district court affirmed the commissioner's order, the issue was reviewed by the court of appeals. That court found that the commissioner's failure to approve the proposed premium increase within the fifteen-day time period specified in Iowa Code section 515A.6(7)(e) (1985) rendered his subsequent action invalid. It therefore reversed the judgment of the district court.

We granted further review of the decision of the court of appeals. Review of the entire record and the arguments presented convinces us that the commissioner's determination should be upheld notwithstanding his failure to strictly adhere to the statutory procedural scheme. We therefore vacate the judgment of the court of appeals and affirm the judgment of the district court.

The National Council on Compensation Insurance (NCCI) collects statistical data on behalf of approximately 200 member and subscriber insurance carriers writing workers' compensation insurance, analyzes that data on a continuing basis, and acts as agent for its members and subscribers in presenting requests for premium changes to the proper state regulatory authorities. It carries out these activities in Iowa and thirty-one other states. On November 18, 1985, NCCI submitted a proposed workers' compensation insurance premium rate filing to the Iowa Commissioner of Insurance (the agency). That filing proposed a 25.2% increase in premium levels effective February 1, 1986.

On December 4, 1985, the agency published the proposed rate filing in the Iowa Administrative Bulletin as required by Iowa Code section 515A.6(7)(a) (1985). On December 31, 1985, and January 2, 1986, respectively, petitioners, Sheet Metal Contractors of Iowa and National Federation of Independent Business (the objectors), filed a demand for hearing on the rate filing as provided by Iowa Code section

515A.6(7). As a result, the agency entered an order on January 10, 1986, setting a public hearing for January 22, 1986, and postponing the effective date of the rate filing pending the hearing and resulting decision. On January 17, 1986, the order setting hearing was expanded so as to provide, in part, as follows:

The hearing in this matter is informal in nature and is not a contested case within the meaning of Iowa Code ch. 17A. The hearing will be conducted without cross-examination or extensive use of witnesses....

After presentation of statements and evidence on January 22, 1986, the record in this matter will be left open for a reasonable period of time....

The order in this matter will either approve or disapprove, without modification, NCCI's rate filing.

On January 22, 1986, a public hearing was held on the rate filing. In addition to presenting statistical evidence on premium-loss ratios deemed to support its request for a premium increase,[1] NCCI presented testimony at the hearing from William Van Ark, an actuary working for that organization in the central region of the United States, and Philip Borba, an economist who specializes in workers' compensation issues. The general conclusions espoused by these witnesses were that, based on the most current data available, projected loss experience and projected costs of processing claims for the period which the rate filing covered justified the proposed premium increases. These witnesses noted that, although the proposed premium increases were large when compared with 1984 levels, the proposals would place the standard premiums only 7.9% above 1979 premium levels. Premium reductions, since 1979, had, they suggested, produced some losses. They stated, however, that their calculations were entirely prospective, utilizing past losses as a guide for predicting future losses.

Sharelle Moranville and Gregory Kohn testified for the objectors at the hearing. Although purporting to testify as experts in the workers' compensation field, their precise qualifications are not set forth in the hearing transcript. Ms. Moranville opined that the NCCI projected data was flawed due to the fact that figures reported to NCCI by its members and subscribers were accepted at face value without being audited at the source. She also indicated that NCCI misclassified losses among the various subgroups of premium payors. Mr. Kohn testified that the projections improperly failed to consider subrogation recoveries, investment income, and coordination offsets of benefits. He also indicated his belief that unfavorable premium-loss ratios were in part due to abnormal variations in the industrial economy.

At the conclusion of the hearing, the commissioner questioned Mr. Van Ark as follows:

Q. Companies really aren't required to report to you the basis for their claims increases or any data related to those claims increases that might tell you why they are occurring, is that correct? A. Really not. We do have a study in a few states called the Detail Claims Study that attempts to answer such questions in terms other than claim frequency. Why is claims size changing? That study has not been implemented in Iowa, and I don't think there would be much light there for us.

Q. Where in the filing do you reflect that large claims increase that's being experienced? A. It would be an Exhibit 1–A and 1–B in the total claims that are being reported to us. In Exhibit 1–A, lines 6 and 12 are the amounts of medical and indemnity benefit costs that have been reported to us; and even with the adjustments downward for the anticipated favorable development of the reserve levels, we still wind up with a cost ratio

1. Included in the documentation submitted for this purpose was Exhibit 1–A showing composite standard earned premiums valued as of December 31, 1984, and factored to adjust the premium level so as to match projected benefit levels

for indemnity and medical costs and increased claims processing costs. Exhibit 1–B submitted with this data made similar projections based on 1984 calendar accident experience.

substantially above what we would like to see.

Q. Okay. I see those summarized, but do you have documentation supporting that in the appendices? A. We have documentation supporting all the adjustments factors. The actual numbers themselves, that's all that we have put in the filing.

Q. For lines 6 and 12 there would be the data supporting the claims increase that's being experienced? A. Other than on that line, that would be it.

Q. So basically—I don't want to misspeak here, but the filing is based—this substantial increase, would it be fair to say is based upon a significant increase in claims, but you have not given me data to show or support these figures in Exhibit 1–A and 1–B? A. Well, we certainly could give you data to support those figures. The data as we collect it, as I discussed earlier, calls for financial data which are sent to us by our several hundred members in Iowa. We go through the validation process, as I mentioned earlier, to remove as many errors as possible from the data and give data of high quality, and we compile it in the computer. The results then show up in the filing as the numbers that are in Exhibit 1. We certainly could give you more detail than you see there at your pleasure, depending on what you would like to see.

The statutory hearing procedures on approval of proposed workers' compensation insurance premium adjustments provide:

Within fifteen days after the start of the hearing, the commissioner of insurance will approve or disapprove the proposed rates and specify the reasons therefor. The commissioner of insurance may suspend or postpone the effective date of the proposed rates pending the hearing and written decision thereon.

Iowa Code § 515A.6(7)(e) (1985). Exactly fifteen days after the hearing commenced on the proposed premium rates, the agency filed an order which provided, in part, as follows:

[T]he rate filing must be disapproved at this time. Based upon a review of the record, it is clear that the filing is incomplete in one respect, and that is its most critical part. Respondent has failed to support its major premise that a premium increase of 25.2% is required due to a sharp increase in claims or claims costs in Iowa. Respondent's statements and representations may be true but without the data to back them up, the standard set out in the Code for approval has not been met.

. . . .

IT IS THEREFORE ORDERED AS FOLLOWS:

1. The November 18, 1985, Iowa Workers' Compensation Filing for Revised Rates and Rating Values is hereby disapproved.

2. The rate filing will be approved at such time as [NCCI] provides the commissioner with the following:

a. Data, including Iowa loss experience and a summary of Iowa loss experience for [NCCI] members, which was used in making the filing and which demonstrates that losses or claims costs have been rising sharply in Iowa at a rate sufficient to justify an overall premium level increase of 25.2%.

b. A certification by the lead actuary responsible for the filing that the data upon which it is based, including the Iowa loss experience, has been validated in accordance with established procedures of [NCCI] as represented at the hearing.

Pursuant to the agency's request, NCCI, on February 18, 1985, filed additional documentation of the aggregate premium-loss data contained in Exhibit 1–A and Exhibit 1–B submitted with the initial rate filing. Also filed with this supplemental data was an actuary's statement that the original filing and all related data on which it was based (including the supplemental data) had been validated in accordance with established procedures.

In response to the agency's request for supplemental data from NCCI, the objectors, on February 25, 1986, filed a motion

with the agency questioning its authority to hold the issue over beyond the fifteen-day period specified in section 515A.6(7)(e) or to proceed further in the face of the February 6, 1986, order purporting to disapprove the filing. The agency resolved this motion in favor of its authority to proceed. It did, however, schedule a hearing at which the supplemental data could be challenged by the objectors.

On February 20, 1986, the objectors petitioned the district court for judicial review of the propriety of the February 6 order. The district court declined to grant relief. Later, the objectors sought a continuance of the hearing scheduled for March 17, 1986, because counsel for one of the objectors was required to be on active military duty at the time. That request was denied by the agency.

At the March 22 hearing, the commissioner questioned NCCI actuary Van Ark as follows with respect to the supplemental data which had been submitted.

Q. Could you, using the supplemental data that was submitted, point to the points of the filing, of the supplemental filing, which you think most clearly illustrate that we've had sharp increases in claims in Iowa? A. Yes sir, the supplemental Exhibit 2 shows, as I said, on net premiums and period losses for our new Exhibit 44, which includes both 2 and standard premium exhibits.... The ratio is stable for the first three years, 69.7, 64.2, 64.2 then it begins to rise ... in the most recent year [to] 106.7, so the total claim and claim adjustment expenses by themselves are actually higher than the premium for the accident year 1984.... Once again, they become unacceptably high. And a large increase is needed.

On April 1, 1986, the commissioner filed an order which stated in part as follows:

Petitioners essentially dispute the accuracy of specific NCCI loss figures when compared with others. However, any such discrepancies are readily explained by the fact that some figures are "developed" for "trend" while others are not.... Petitioners make no challenge

to the underlying methodology by which the NCCI produces its "target cost ratio" and their attacks on the trend of losses, as set forth by NCCI, are incomprehensible....

There is substantial indication that the present rates are inadequate. Sharp increases in claim frequency are producing ever-mounting losses for insurers doing business in Iowa.... Specifically, evidence at the hearing shows that if incurred benefit payments rise by another $12,000,000 in 1986, the combined loss ratio will reach 116%....

It should be noted that even though the proposed rate increase is much greater than the filing now in effect, approval of this rate filing will produce a rate increase of only 7.9% over the rate level prevailing in 1979 because rates have generally declined over the past five years.

In sum, the Commissioner concludes the NCCI has met its burden of justifying the requested overall rate increase of 25.2%.

The objectors, Sheet Metal Contractors of Iowa and National Federation of Independent Business, filed a petition for judicial review of the agency's April 1, 1986, order. They continued to assert that the February 6, 1986, order, purporting to disapprove the filing, was a final order which terminated the rate proceeding and divested the agency of authority to act on the supplemental data thereafter submitted by NCCI. As previously noted, that contention was rejected by the district court but was accepted by the court of appeals. We consider this issue and other matters urged in the objectors' petition for judicial review.

### I.  *Finality of February 6, 1986, Order.*

■ The district court rejected the objectors' contention that the February 6, 1986, order was a final rejection of the rate filing which relegated NCCI to the position of having to file anew in order to carry the matter further. It based this determination on the provisions of Iowa Code section 515A.4(1) (1985) which provides:

When a filing is not accompanied by the information upon which the insurer supports such filing, and the commissioner does not have sufficient information to determine whether such filing meets the requirements of the chapter, the commissioner shall require such insurer to furnish the information upon which it supports such filing and in such event the waiting period shall commence as of the date such information is furnished.

The objectors maintain the district court's reliance on section 515A.4(1) is misplaced because a proviso contained in section 515A.6(7) states that the procedures of that subsection of the Code shall govern "[n]otwithstanding any other provision of the Code." The objectors contend that the requirement of section 515A.6(7)(e) that the commissioner approve or disapprove the proposed rates within fifteen days of the start of the hearing is mandatory and may not be avoided through the guise of requesting supplemental data.

The court of appeals believed that the issue was not whether the agency had power to act on the premium rate filing after the expiration of the statutory fifteen-day period, a question which it declined to answer, but rather whether the February 6 order was a final and dispositive order terminating the proceeding. It resolved that question in the affirmative thus visiting upon NCCI's members and subscribers a total denial of the proposed premium increase and forcing them into the position of filing a new "prospective only" application for premium increases.

In challenging the conclusion of the court of appeals, NCCI and the commissioner assert that the district court was correct in upholding the commissioner's reliance on the supplemental filing based on the language of section 515A.4. In the alternative, they contend that, if that statute is inapplicable to workers' compensation premium filings, it is nevertheless inappropriate to inflexibly apply the fifteen-day time limitation of section 515A.6(7)(e) so as to invalidate the agency's ultimate approval of its rate request. In support of this position, appellees urge that the fifteen-day period specified in the latter statute should be viewed as directory rather than mandatory.

The objectors assert that the court of appeals correctly concluded that the February 6, 1986, order was a final disapproval of the rate request which precluded the agency from proceeding further with respect to NCCI's November 18, 1985, filing. They also contend that, even if the February 6 order is not so construed, any agency action after the expiration of the fifteen-day period exceeded its scope of authority under the applicable statutes.

In resolving these competing claims, we begin with the observation that the language of the February 6, 1986, order belies any intention to terminate the rate proceeding adversely to NCCI at that point. The wording employed more nearly denotes a conditional approval of the request than a conditional denial thereof. Indeed, the order proceeds as if approval will be automatic upon the filing of the supplemental data. The order appears to echo the concern expressed during the commissioner's questioning of Mr. Van Ark at the conclusion of the January 22, 1986, hearing. At that time, the commissioner sought to ascertain whether there was raw claim documentation to support the aggregate figures which appear in Exhibit 1–A and Exhibit 1–B of the rate request. In response, he was assured that such raw claim documentation did exist and would be produced upon request. The conditional features of the February 6 order appear to directly address and respond to the concerns expressed in that colloquy.

As a result of our conclusion that the February 6 order denotes conditional approval of the rate filing, we believe it would be exalting form over substance to uphold the court of appeals' reliance on that order as the source of a final denial of these requests. The objectors' arguments in favor of the finality of the February 6 order should be upheld, if at all, only if the time limitations contained in section 515A.6(7)(e) are viewed as a limitation on the power of the agency to act beyond that time.

In analyzing the effect of the time limitation imposed by that statute, NCCI correctly urges that the issue is not whether the commissioner was subject to an obligatory duty to resolve the rate application within fifteen days but rather whether his failure to perform that duty should have the effect of invalidating the agency's action. In considering a similar issue in *Taylor v. Department of Transportation,* 260 N.W.2d 521 (Iowa 1977), we stated:

> The mandatory-directory dichotomy does not refer to whether a statutory duty is obligatory or permissive but instead relates to whether the failure to perform an admitted duty will have the effect of invalidating the governmental action which the requirement affects.

*Id.* at 523. The test for determining when governmental action not conforming to statutory mandates should be invalidated was stated as follows in *Taylor:*

> If the prescribed duty is essential to the main objective of the statute, the statute ordinarily is mandatory and a violation will invalidate subsequent proceedings under it. If the duty is not essential to accomplishing the principal purpose of the statute but is designed to assure order and promptness in the proceeding, the statute ordinarily is directory and a violation will not invalidate subsequent proceedings unless prejudice is shown.

*Id.* at 523.

Arguably, all of the reasons which prompted the legislature to enact section 515A.6(7)(e) may not be apparent. We believe, however, that it is more likely than not that a time limitation was imposed to assure as nearly as practicable that the rate proceeding would be conducted in a reasonably prompt fashion. Although the fifteen-day period generally reflects the legislature's view as to the proper time frame in which the agency should act, we cannot read into the statute the intent to deny the agency the power to act beyond that time should exigencies require it to do so. Although we do not disagree with the court of appeals' conclusion that section 515A.4(1) is not directly applicable to workers' compensation rate proceedings, we

nevertheless conclude that the agency was acting within its authority in filing the conditional order on February 6.

Because we believe that the agency's authority to act on NCCI's November 18, 1985, rate filing was not terminated on February 6, 1986, it is incumbent upon the objectors to establish some prejudice as a consequence of the ensuing delay in order to secure relief. Such a showing of prejudice is required by our holding in *Taylor* as well as by the language of Iowa Code section 17A.19 limiting the right of judicial review to "a person or party who is aggrieved or adversely affected by agency action."

The court of appeals opinion attempts to demonstrate prejudice to the objectors by comparing the impact of the delayed approval upon the payors of workers' compensation insurance premiums with the impact which would have occurred had NCCI been required to file anew. We conclude that this is not the proper test of prejudice for purposes of applying the mandatory-directory dichotomy envisioned in *Taylor.* The determination of whether sufficient prejudice exists to invalidate the agency's action should focus on the extent to which the period of delay beyond the statutory norm may have altered the result adversely to the objectors.

We are not persuaded that the relatively short period of delay which resulted in the present case was significantly prejudicial to the objectors to warrant invalidating the agency's action. The objectors' arguments to the contrary proceed on the theory that if the agency had not delayed its decision in order to obtain the supplemental data it would have had no choice other than to deny the proposed increase in premium rates. We strongly disagree with that contention. The agency's intention to approve the request was, as we have previously noted, implicit in the February 6, 1986, order. Its authority to do so on the state of the record existing at that time cannot be denied. The agency had before it the sworn testimony of Mr. Van Ark that the aggregate figures contained in Exhibit 1–A and Exhibit 1–B accurately reflected actual

loss experience which had been reported to NCCI. Under the circumstances, the agency's decision to delay final approval until additional documentation was furnished is no indication that it would have denied the request had such supplemental data been unavailable.

The objectors' reliance on the case of *State v. State Board for Property & Casualty Rates*, 731 P.2d 394 (Okla.1986), is misplaced. That case was decided under a statutory scheme which differs substantially from the applicable Iowa statutes. To the extent that the case poses an issue concerning the agency's failure to act within a statutorily specified time, it treats this issue within the context of a delay on the effective date of a proposed rate increase. It does not involve the effect of such delay on the final determination of a proper rate.

For all of the reasons stated, we disagree with the court of appeals' conclusion that the agency acted beyond its authority in entering the April 1, 1986, order.

II. *Fairness of the Proceedings Which Occurred Subsequent to February 6, 1986.*

We next consider the objectors' contentions that they were treated unfairly with regard to the supplemental data filed in response to the February 6, 1986, order and the March 17, 1986, hearing which was held to consider that newly filed material. The objectors' principal contentions in this regard involve the limited scope of the March 17, 1986, hearing and the denial of their motion to continue the hearing on the basis that counsel for one of the objectors had been called to active military duty with the National Guard. Treating these contentions in inverse order, we are satisfied that they afford no basis for granting relief from the agency's April 1, 1986, order.

■ We have recognized that an agency is vested with considerable discretion in ruling on motions to continue an administrative hearing. *Fischer v. Iowa State Commerce Comm'n*, 368 N.W.2d 88, 96 (Iowa 1985). In upholding an agency's decision to deny a continuance in *Fischer*, we characterized that decision as a desirable move toward the expeditious conclusion of an already lengthy administrative process. *Id.* at 96. Utilizing the *Fischer* rationale, we believe that the agency in the present case did not abuse its discretion by denying a motion which would have further delayed a process which already exceeded the time frame established by the legislature. Moreover, although each objector was represented by its own counsel, their interests throughout the proceedings were indistinguishable. The agency had every reason to believe that counsel for the other objector could adequately represent the rights of both parties at the supplemental hearing.

■ We also reject the contention that the scope of the March 22, 1986, hearing was unduly limited. Section 515A.6(7) provides "[e]xcept as otherwise provided herein, the provisions of this subsection shall not be subject to the requirements of chapter 17A." We view this provision as negating any requirement that the hearings held pursuant to this statute be conducted in accordance with contested case procedures. Consequently, it was not necessary for the agency to view the present proceedings as an adversarial adjudicative process. It was more nearly acting in an investigatory, inquisitorial, and quasi-legislative capacity.

■ Given the type of hearing involved and the manner in which the issues were presented, we believe the objectors were given an adequate opportunity to respond to all data presented by NCCI including the supplemental filings. Although the order setting the supplemental hearing on March 22, 1986, purported to limit its scope to challenges to the supplemental data, arguments were permitted on the part of the objecting parties with respect to all aspects of the rate issue.

III. *Whether the Failure to Afford Objectors a Contested Case Hearing Was Contrary to Agency Rules.*

■ The objectors contend that despite the proviso contained in section 515A.6(7), which renders the formal requirements of Iowa Code chapter 17A inapplicable, the

agency was nevertheless required to follow contested case hearing procedures under its own rules. It bases this conclusion on the provisions of 510 Iowa Administrative Code 3.1 which provides:

> The procedures contained in the rules of this chapter and in Chapter 17A, The Code, shall govern all administrative hearings, and all matters related thereto, conducted by the insurance department and the securities department.

The agency contends that the administrative rule in question antedated the statutory proviso relieving the agency from the formal requirements of chapter 17A. The objectors dispute this and point out, correctly we believe, that the present version of the rule became effective a few days after section 515A.6(7) became effective. Notwithstanding this circumstance, we believe that it would have been erroneous for the agency to apply this rule to a section 515A.6(7) public hearing. That statute unequivocally provides:

> Except as otherwise provided herein, the provisions of this subsection shall not be subject to the requirements of chapter 17A. The procedures for such hearing shall be as follows: [hearing procedures outlined in statute].

An administrative rule cannot be applied in a manner which contravenes an express legislative directive. *McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181, 196 (Iowa 1980); *Temple v. Vermeer Mfg. Co.*, 285 N.W.2d 157, 159 (Iowa 1979).

### IV. *Objectors' Challenges on the Merits.*

█ Finally, we consider the objectors' challenges to the April 1, 1986, order on the merits. The objectors contend that insuffi-cient evidence was presented to support the agency's approval of the proposed increase in premium rates. Because this proceeding does not involve contested case hearing procedure, such challenges are limited to those statutory grounds applicable in challenging "other agency action." *See Allegre v. Iowa State Bd. of Regents*, 349 N.W.2d 112, 114 (Iowa 1984); *Polk County v. Iowa State Appeal Bd.*, 330 N.W.2d 267, 276–77 (Iowa 1983). Challenges to this type of agency action are limited to showing (1) errors of law by the agency as specified in subsections (a), (b), (c), (d) and (e) of section 17A.19(8); and (2) unreasonable, arbitrary or capricious action by the agency as specified in section 17A.19(8)(g).

█ Notwithstanding some conflicting language found in *Churchill Truck Lines v. Transportation Regulation Board*, 274 N.W.2d 295, 299–300 (Iowa 1979), upon which the parties place some reliance, a sufficiency-of-evidence challenge such as that contemplated by section 17A.19(8)(f) is not available in reviewing other agency action.[2] Unless specifically provided by statute, no particular evidentiary record is required.[3]

█ Although the objectors may not mount a section 17A.19(8)(f) challenge to the evidentiary support for the agency's action, they may lodge an indirect evidentiary challenge by questioning the agency's application of section 515A.6(7)(d). That statute provides that "the rating organization shall bear the burden of proof to support the proposed rates by a preponderance of the evidence." Iowa Code section 515A.3(1) provides, in part:

---

2. The references in the *Churchill* case to the need for substantial evidence to support agency action was, we believe, a general discussion and does not focus on the more limited statutory basis for attacking that particular category of administrative activity known as "other agency action."

3. We reject the contention that the language of section 17A.19(7) authorizing a court to hear and consider "such evidence as it deems appropriate" provides authority to challenge "other agency action" based on a claimed absence of substantial evidentiary support. The taking of evidence in the district court pursuant to the quoted language must, we believe, be for the limited purpose of highlighting what actually occurred in the agency so as to facilitate the court's search for errors of law or unreasonable, arbitrary or capricious action. *Iowa Bankers Ass'n v. Iowa Credit Union Dep't*, 335 N.W.2d 439, 448–49 (Iowa 1983). Such evidence is not to be utilized to demonstrate that the agency's action is unsupported by substantial evidence in the record made before the agency.

**868**

Rates shall be made in accordance with the following provisions:

a. Rates shall not be excessive, inadequate or unfairly discriminatory.

b. Due consideration shall be given to past and prospective loss experience within and outside this state, to the conflagration and catastrophe hazards, to a reasonable margin for underwriting profit and contingencies, to dividends, savings, or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers, to past and prospective expenses both countrywide and those specially applicable to this state, and to all other relevant factors within and outside this state ....

Testing the agency's order by these statutory standards, we conclude that its approval of the proposed premium rate increases should be upheld. Evidence presented in favor of NCCI's application shows that its members and subscribers experienced a sharp increase in the frequency of claims in 1983 and 1984. This was the primary impetus behind the rate filing, although rising medical costs were also a factor. In 1984, NCCI members experienced a thirty percent increase in frequency of claims over 1983. Figures for 1984 represented a forty-eight percent increase from 1980. If 1985 results followed the trend established in 1984, it may be projected that the proposed premium increase was necessary in order to cover the payment of indemnity benefits, medical benefits, claim adjustment costs, general overhead expenses, and leave some reasonable margin of profit for the underwriting insurance companies.

Although the objectors raise some interesting questions concerning the reasons for the increase in loss ratios, we agree with the agency that, for purposes of determining an adequate premium rate, the reasons for the increase in claims are less important than the fact that the increases are occurring.

We have considered all arguments advanced by the appellants and conclude that no basis has been shown for overturning the agency's determination. We therefore vacate the judgment of the court of appeals and affirm the judgment of the district court.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.