Randall SILVER and Mikala Silver, individually, parents, and next of kin of Michael R. Silver, deceased, minor child, Plaintiffs–Appellants,

v.

Christine Annette SLUSHER, a/k/a Christine Annette Stingley, Ken Becknell, individually and d/b/a Cowboy Country, Ricky B. Henderson, Defendants,

and

Farmers & Merchants Insurance Co., Defendant–Appellee.

No. 64879.

Supreme Court of Oklahoma.

May 3, 1988.

As Corrected May 13, 1988.

As Corrected on Denial of Rehearing Feb. 28, 1989.

Clifton D. Naifeh, Naifeh & Woska, P.C., Oklahoma City, for plaintiffs-appellants, Randall Silver and Mikala Silver.

Jim W. Lee, Barry R. Davis, Lee, Beuch and Davis, Oklahoma City, for defendant-appellee, Farmers & Merchants Ins. Co.

OPALA, Justice.

The dispositive issue is whether the terms of 36 O.S.1981 § 3636[1] impose an affirmative duty upon insurers to provide an explanation of uninsured motorist coverage [UMC] to the named insureds as an indispensable precondition for a statutorily effective rejection. We answer in the negative.

Randall and Mikala Silver [insureds or the Silvers] were named insureds of an automobile insurance policy with Farmers & Merchants Insurance Co. [insurer or Farmers], which was purchased in 1975. At that time Mikala Silver rejected uninsured motorist coverage for both her husband, Randall, and for herself by signing a statement which accompanied the insurance application.[2] The forms were believed

---

1. The pertinent terms of 36 O.S.1981 § 3636 provide:

"(A) *No policy* insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle *shall be issued, delivered, renewed, or extended in this state ... unless the policy includes the coverage* described in subsection (B) of this section.

(B) *The policy ... shall provide coverage ...* for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom. *Coverage shall not be less than the amounts or limits prescribed for bodily injury or death for a policy meeting the requirements of Section 7-204 of Title 47, Oklahoma Statutes ...* provided, however, that *increased limits of liability shall be offered* and purchased if desired, not to exceed the limits provided in the policy of bodily injury liability of the insured....

\* \* \* \* \* \*

(F) *The named insured shall have the right to reject such uninsured motorist coverage in writing,* and except that unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to him by the same insurer." [Emphasis added.]

2. The 1975 rejection form provides in pertinent part:
" \* \* \*

REJECTION OF UNINSURED MOTOR VEHICLE INSURANCE COVERAGE
\* \* \* \* \* \*

The undersigned insured (and each of them) has been offered Uninsured Motorist Coverage, in accordance with the law, and does hereby reject such coverage, and does not choose to pay the additional applicable premium.

to have been filled out by the insurance agent on Randall's instructions.[3]

The next year they received by mail from the same agent another application for insurance and again opted to exclude UMC from the Farmers policy.[4] Before both insureds signed the rejection statement, Randall allegedly telephoned the agent's office for an explanation of UM coverage. He claims to have been told by an unidentified person that UMC covers only *property* damage caused by an uninsured motorist. It is asserted that relying on that answer, Randall signed the form, instructed his wife to do the same, and mailed it back to the agent. Randall allegedly relied upon this information about UMC when he once more signed a rejection statement five years later and authorized his mother to sign two others on his behalf.[5]

In late 1983 the Silvers' minor child was killed when struck by an uninsured motorist. The insureds sued and took judgment against the driver for a sum that exceeds the aggregate limits of public liability coverage provided by Farmers ($10,000.00 per person/$20,000.00 per occurrence) on each of three vehicles which were then owned by the Silvers. Admitting that UM coverage had been rejected and hence neither purchased nor included in any policy issued to

---

The coverage (rejected) provides for the protection of persons insured under this policy who would be legally entitled to recover damages from the owner or operator of an uninsured motor vehicle because of bodily injury, sickness or disease, including death resulting therefrom.

This rejection continues in effect on all future renewal policies, renewal certificates, renewal notices and reinstatements or until such time as a premium is paid for Uninsured Motorist Coverage."

3. The agency status, within the meaning of 36 O.S.1981 § 1423, of the person with whom the insureds dealt—whether as agent of Farmers or of the Silvers—is of no consequence to the outcome of the instant appeal. This is so because (a) as we analyze the insureds' claim, its gravamen is the Silvers' allegedly flawed UMC rejection rather than the insurer's fraudulent misrepresentation and (b) our holding today rests *solely* on the view that the provisions of § 3636 cast no affirmative duty upon insurers to provide an explanation of UM coverage as an indispensable precondition for a statutorily effective rejection. Neither need we address here the question—raised by the Silvers—whether the trial court erred in severing for trial their claim against Farmers from that against the tortfeasors.

4. The pertinent portions of the rejection form Randall and Mikala Silver signed in 1976 are:
" * * *

UNINSURED MOTORIST COVERAGE (OKLAHOMA)

The Oklahoma Legislature passed House Bill 1198 amending Section 3636 of the Uninsured Motorist law. This law requires Insurance Companies to offer Uninsured Motorist limits not to exceed your present Bodily Injury Liability limits you now carry.

Please express your intent and acknowledge this offer by the Company by checking *only one* of the appropriate boxes below:

____ I desire Uninsured Motorist Coverage for the same limits I now have on my policy.

____ I desire Uninsured Motorist Coverage (not to exceed my present Bodily Injury Liability limits) and will remit the proper premium therefore.

Urgent—If you check this option, contact your Agent for the amount of additional premium to remit to the Company.

____ I reject Uninsured Motorist Coverage in its entirety and agree that said rejection is to be continuous until a premium is paid for Uninsured Motorist Coverage."

5. All total, three rejections were effectuated since 1976 on identical written applications for automobile insurance. One of these was signed by Randall Silver in 1981, and two were signed, in 1982 and 1983, by his mother as an admitted agent. The pertinent terms of those rejection statements are:
" * * *

PROTECTION AGAINST UNINSURED MOTORIST INSURANCE

It is agreed that Uninsured Motorist Coverage under the Oklahoma Uninsured Motorist Act, Section 3636, Oklahoma Statutes has been offered to the undersigned insured (and each of them) and

____ I desire Uninsured Motorist Coverage with limits of liability of $____/____

Bodily Injury (not to exceed limits of Bodily Injury of policy)

____ I reject Uninsured Motorist Coverage in its entirety.

If Uninsured Motorist Coverage is rejected, the rejection continues in effect on all future renewal policies, renewal certificates, renewal notices and reinstatements or until such time as a premium is paid for Uninsured Motorist Coverage.
* * * "

We need not and do not reach here the question whether § 3636 requires each named insured to reject UM coverage in writing, where more than one insured is named in a policy and at least one of them decides to reject UMC.

them by Farmers, the Silvers nonetheless sued their insurer for UM benefits because of its *failure to explain UM coverage to Randall Silver "properly, fully and adequately."* They alleged Farmers is liable for all damages occasioned by their son's death because it failed to secure Randall's "knowing and intelligent" rejection of UMC.

■ Although, when urged to do so, the trial court refused to dismiss the claim, it postponed deciding whether the insureds had knowingly rejected UMC. After a hearing summary judgment was rendered for Farmers and the Silvers appealed.[6] Neither the legal theory of the Silvers' claim nor that on which the trial court rested its decision for Farmers is apparent from the record. If the trial court was correct under *any* theory this court's duty is to affirm the judgment.[7]

## I

## THE NATURE OF THE INSUREDS' CLAIM AGAINST FARMERS

■ The insureds' single pleading against Farmers is far more revealing in what it does not allege than in what may be divined from its meager contents. Even though the Silvers averred that Farmers "improperly informed [Randall Silver] that [UMC] would only cover property damage if [the insureds] or their family members were involved in a collision with an uninsured motorist," they stated no common-law claim for bad faith, intentional misrepresentation or fraud.[8] They sought neither

---

**6.** Neither the Silvers nor Farmers complains of procedural imperfections in the summary judgment process. The journal entry, which was signed by these parties' lawyers, indicates judgment was pronounced after "full file review and consideration of the briefs, deposition testimony, and affidavits." The absence from the record of a summary judgment motion is not fatal to the validity of the trial court's disposition because the terms of 12 O.S.Supp.1984 § 2012(B) provide in pertinent part:

"... *If,* on a motion asserting the defense numbered 6 of this subsection to dismiss for failure of the pleading to state a claim upon which relief can be granted, *matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment* and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by the rules for summary judgment...." [Emphasis added.]

**7.** See *Utica Nat. Bank and Trust v. Assoc. Prod.,* Okl., 622 P.2d 1061, 1066 [1981]. A pleader need not state the theory of recovery upon which he relies. *Doss Oil Royalty Co. v. Texas Co.,* 192 Okl. 359, 137 P.2d 934, 939 [1943]; *Oleck v. Fischer,* 401 F.Supp. 651, 655 [S.D.N.Y.1975].

**8.** The elements of a common-law action for fraud are: 1) a material misrepresentation, 2) knowingly or recklessly made, 3) with intent that it be relied upon, and 4) the party relying on the false statement suffers damages. *Bras v. First Bank & Trust Co.,* Okl., 735 P.2d 329, 333 [1987]; *D & H Co., Inc. v. Shultz,* Okl., 579 P.2d 821, 824 [1978]. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." 12 O.S.Supp.1987 § 2009(B).

*An action for fraud may not be predicated on false statements when the allegedly defrauded party could have ascertained the truth with reasonable diligence. Sokolosky v. Tulsa Orthopaedic, Etc.,* Okl., 566 P.2d 429, 431 [1977]; *Onstott v. Osborne,* Okl., 417 P.2d 291, 293 [1966]. "Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he had been deceived by the vendor's misrepresentations." *Nowka v. West,* 77 Okl. 24, 186 P. 220 [1919] (syllabus).

*The Silvers themselves* described their claim in a brief to the trial court as follows:

"*Plaintiffs [the insureds] do not allege that the Defendant [Farmers] acted in bad faith or that somehow Defendant intentionally misrepresented the coverage and terms available....* Although the Defendant's misrepresentations *cannot be said to have been intentionally fraudulent,* the discussions resulting in the rejectment by Plaintiffs of uninsured motorist coverage were nevertheless flawed inasmuch as said representations induced reliance on the part of Plaintiffs, Randall and Mikala Silver on false and improper representations of material facts." [Emphasis added.]

At common law, statements in a brief were not treated as admissions. Today, under 12 O.S. Supp.1984 § 2012(B), *supra* note 6, if materials *dehors* the pleadings are tendered for consideration on a motion to dismiss, summary judgment procedure must be utilized. *McElearney v. University of Ill., Etc.,* 612 F.2d 285, 290 n. 3 [7th Cir.1979]; *United Steelworkers v. American Internat'l Aluminum Corp.,* 334 F.2d 147, 149 [5th Cir.1964] (briefs); *Judge v. Johnston Warren*

coverage based on breach of contract or estoppel nor rescission of their rejection on grounds of mutual mistake of law or of fact.[9] *Their theory was grounded solely upon a breached "duty to inform."* They alleged Randall Silver "lacked the requisite informed consent to sign a rejection" of UM coverage as a result of Farmers' failure to inform him that UMC provides benefits in the event bodily injuries are sustained from the negligence of an uninsured motorist. If the claim so stated were legally cognizable under the breach-of-duty-to-inform theory, though questions of material fact would be present, the insureds might be entitled to recover at least the minimum statutory UM protection.[10]

▬▬▬ The insureds' action against Farmers appears to be neither *ex contractu* nor *ex delicto*. Recovery under the theory of constructive fraud is also unavailable to them.[11] Insofar as the Silvers' suit was pressed to establish their demand for uninsured motorist protection mandated by § 3636, the gravamen of the claim was breach of some duty to explain UM coverage as a precondition to a statutorily effective rejection.[12]

---

*Lines, Ltd.,* 205 F.Supp. 700, 702 [D.Mass.1962] (statements of counsel at oral argument); *White v. Peabody Const. Co., Inc.,* 434 N.E.2d 1015, 1018–1019 [Mass.1982] (statements of counsel at oral argument establishing *admissions* ). See also *Womack v. City of Oklahoma City,* Okl., 726 P.2d 1178, 1181 n. 8 [1986], for the use of admissions in a brief on appeal.

**9.** "A contract is extinguished by its rescission." 15 O.S.1981 § 232. "A party to a contract may rescind the same in the following cases only:
"1. If the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party.
2. If through the fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part.
3. If such consideration becomes entirely void from any cause.
4. If such consideration, before it is rendered to him, fails in a material respect, from any cause; or,
5. By consent of all the other parties." 15 O.S.1981 § 233.

**10.** 36 O.S.1981 § 3636(A), (B), and (F), *supra* note 1; *Moser v. Liberty Mut. Ins. Co.,* Okl., 731 P.2d 406, 408 [1987].

**11.** "Fraud is either actual or constructive." 15 O.S. 1981 § 57. Although constructive fraud need not involve intent to deceive and may be based on a negligent or innocent misrepresentation, it requires a breach of some legal or equitable duty. 15 O.S. 1981 § 59, *infra; Faulkenberry v. Kansas City Southern Ry. Co.,* Okl., 602 P.2d 203, 206 [1979]. Accord *Riley Hill Gen. Contr. v. Tandy Corp.,* 303 Or. 390, 737 P.2d 595, 604 [1987] and *Tatum v. Mid-Century Ins. Co.,* 730 S.W.2d 41, 43 [Tex.App.1987].
The Silvers are precluded from recovery under the theories of constructive fraud and negligent misrepresentation because 1) we hold today that

Farmers was under no statutory duty to explain UMC to them, 2) their relationship with Farmers was *stricto sensu* at arms' length and they did not stand *vis-a-vis* each other in any recognized form of "special relationship," see *Faulkenberry, supra,* at 205 n. 2, and 206, and 3) they submitted but *one* theory to the trial court, that of "waiver" or "breach-of-duty-to-inform", and are hence precluded from seeking relief on appeal under any other theory, see *General Motors v. Okl. Cty. Bd. of Equal.,* Okl., 678 P.2d 233, 239 [1983]; *Maryland Casualty Company v. Willsey,* Okl., 380 P.2d 254, 259 [1963]; *County of Okmulgee v. Robnett,* Okl., 368 P.2d 502, 506 [1962]; and *Cities Service Oil Company v. Merritt,* Okl., 332 P.2d 677, 683 [1958].
The terms of 15 O.S. 1981 § 59 provide:
"Constructive fraud consists:
1. In any *breach of duty* which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,
2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud." [Emphasis added.]

**12.** See *Oklahoma Natural Gas Co. v. Pack,* 186 Okl. 330, 97 P.2d 768, 770 [1940].
"Waiver" is the voluntary, intentional relinquishment of a known right. The person against whom waiver is asserted as a defense must have had full knowledge of the existence of his rights as well as of all the material facts upon which those rights depended. *Faulkenberry v. Kansas City Southern Railway Company, supra* note 11 at 206–207 [1979].

## II

### 36 O.S.1981 § 3636 [13] IMPRESSES NO AFFIRMATIVE DUTY UPON INSURERS TO PROVIDE AN EXPLANATION OF UMC TO NAMED INSUREDS AS AN INDISPENSABLE PRECONDITION FOR A STATUTORILY EFFECTIVE REJECTION

■ *Insurance is a contract.* 36 O.S. 1981 § 102.[14] The relationship between the insured and insurer clearly is *contractual* in nature,[15] and we find nothing in § 3636 that alters the traditionally commercial setting in which insurance policies are purchased. Our UMC statute creates no fiduciary obligations, and its scheme is not consistent with consumer protection laws.[16] Rather, the essence of § 3636 is *regulatory.*[17] Its object is to provide UM protection only for those who do not reject it in writing.

■ No challenge is made here either to the *legal sufficiency* of Farmers' offer of increased UMC limits [18] or to the insureds' *opportunity* to reject UM coverage entirely. As offeror, Farmers had no contractual duty *voluntarily* to explain the terms of its offer or the advantages and disadvantages to procuring UM coverage.[19] Nothing in § 3636 makes it necessary for an insurer to make *an express offer to exclude UMC* from its policy anterior to the named insured's decision to opt out of the mandated protection.[20] All that is required by § 3636 for an effective rejection is a writing signed by the named insured.[21] An initial rejection suffices to relieve insurers of their statutory obligation to include UMC in subsequent *renewals,* unless the named insured requested the omitted coverage in writing.[22]

There are three separate sources which give rise to the creation of rights under Oklahoma law: the state constitution, her statutes and her common law.[23] In the context of this case, the general principles of contracts, insofar as they apply to insurance policies, are instituted not only by general statute,[24] but also by the Insurance

13. For the pertinent text of 36 O.S.1981 § 3636, see *supra* note 1.

14. The terms of 36 O.S.1981 § 102 are:
" 'Insurance' is a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingincies."

15. *Christian v. Metropolitan Life Ins. Co.,* Okl., 566 P.2d 445, 448 [1977].

16. See, e.g., the Uniform Consumer Credit Code, 14A O.S.1981 §§ 1–101 et seq. Its purposes include 1) furthering "consumer understanding of the terms of credit transactions," 14A O.S.1981 § 1–102(2)(c), and 2) protecting consumers from unfair practices, 14A O.S.1981 § 1–102(2)(d). Disclosure requirements are a primary means to achieve legislative intent. See, e.g., 14A O.S. 1981 §§ 2–301, 2–302 and 5–204. To insure greater protection, waiver of rights under the UCCC is generally prohibited. 14A O.S.1981 § 1–107(1).

17. 36 O.S.1981 § 109; *State v. Okl. State Bd. for Property,* Okl., 731 P.2d 394, 401 [1987]; *Winston–Norris Co. v. King,* 119 Okl. 109, 249 P. 319, 320 [1926]. The terms of 36 O.S.1981 § 109 provide:
"No person shall transact a business of insurance in Oklahoma without complying with the applicable provisions of this Code [36 O.S. 1981 §§ 101 et seq.]."

18. Insurers are required by 36 O.S.1981 § 3636(B) to offer increased limits of UMC. For the pertinent text of § 3636(B) see *supra* note 1.

19. Generally, an offer is sufficient if its acceptance and nothing further will result in an enforceable contract. See *Davenport v. Doyle Petroleum Corporation,* 190 Okl. 548, 126 P.2d 57, 60 [1942] and *Fry v. Foster,* 179 Okl. 398, 65 P.2d 1224, 1226 [1937].

20. See *Geisler v. Mid–Century Ins. Co.,* 712 S.W. 2d 184, 187 [Tex.App.1986].

21. 36 O.S.1981 § 3636(F), *supra* note 1.

22. 36 O.S.1981 § 3636(F), *supra* note 1. Material changes in "renewals" create "new" policies of insurance and thus make it incumbent upon insurers to procure new rejections. *Beauchamp v. Southwestern Nat. Ins. Co., Okl.,* 746 P.2d 673, 676 [1987]. Neither here nor below did any party to this appeal raise the question whether the Silvers' applications for insurance were for new policies or renewals.

23. See *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 [1985]; *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577–578, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 [1972]; 12 O.S.1981 § 2, *infra* note 26.

24. See note 26, *infra.*

Code itself.[25] The common law supplements our statutes. It remains in full force unless it is clearly and expressly modified or abrogated by our constitution or by statute.[26] *Because § 3636 contains no language which alters the basic, arms' length nature of the insured-insurer relationship, we decline to read into the UM statute a duty charging insurers with the responsibility of detailed and formalistic explanation as an indispensable precondition for securing from the named insured a statutorily effective rejection of uninsured motorist coverage.*[27] Where no duty exists, there can be no right.[28] Since Farmers stood obligated neither by contract nor by statute to apprise the insureds

of all the facts about UMC, there was no right subject to waiver. We hold that no disputed material issue of fact came to be tendered below. Summary judgment must hence be affirmed.[29]

The result reached today is not inconsistent with that portion of *Hicks v. State Farm Mutual Automobile Insurance Company*[30] which dealt with the validity of a named insured's UMC rejection.[31] When called upon to carry out the public policy mandate of our UM statute, this court has consistently respected the contractual nature of the insured-insurer relationship and the applicability of contract principles.[32] The rules of waiver and estop-

---

**25.** See 36 O.S.1981 § 102, *supra* note 15.

**26.** 12 O.S.1981 § 2; *Davis v. Davis,* Okl., 708 P.2d 1102, 1111 [1985]; *State Mut. Life Assur. Co. of Amer. v. Hampton,* Okl., 696 P.2d 1027, 1036 [1985] (Opala, J., concurring). The terms of 12 O.S.1981 § 2 provide:

> "*The common law, as modified by constitutional and statutory law, judicial decisions* and the condition and wants of the people, *shall remain in force* in aid of the general Statutes of Oklahoma; but the rule of the common law, that statutes in derogation thereof, shall be strictly construed, shall not be applicable to any general statute of Oklahoma; but all such statutes shall be liberally construed to promote their object." [Emphasis added.]

**27.** To hold that insurers must give named insureds a judicially prescribed cluster of information as a prerequisite for a valid rejection would be to transpose their contractual relationship into one that requires *Miranda*-like treatment of insureds by their insurance providers. See *Johnson v. Concord Mutual Insurance Co.,* 300 A.2d 61, 66 [Penn.1973] (Pomeroy, J., concurring), citing *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 [1966].

**28.** *Hall Jones Oil Corporation v. Claro, Okl.,* 459 P.2d 858, 861–862 [1969]; *Oklahoma Natural Gas Co. v. Pack, supra* note 12. See also W. Hohfeld, Fundamental Legal Conceptions (1923) at 78, quoting from Leake, Law of Property in Land (1st ed., 1874) at 1–2:

> "'*Rights against persons, jura in personam* ... have for their *subject* an *act or performance* of some certain determinate person, as the payment of money, the delivery of goods and the like. A right of this kind imports the correlative *positive* legal duty in the determinate person to act in the manner prescribed. It *depends for its exercise or enjoyment* upon the performance of that duty, and is secured by the legal remedies provided for a breach of performance....'" [Emphasis theirs.]

**29.** Today's holding is grounded on the conclusion that under the single theory of recovery found applicable to their claim, the Silvers cannot prove any set of facts that would have entitled them to relief against Farmers. See 12 O.S.Supp.1984 § 2012(B)(6); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 [1957]; Committee Comment to 12 O.S.Supp. 1984 § 2012. No harm resulted from the trial court's summary judgment disposition, because the evidentiary materials on record support its ruling.

**30.** Okl., 568 P.2d 629, 633 [1977].

**31.** In *Hicks v. State Farm Mutual Automobile Insurance Company, supra* note 30, as in the case at bar, there was no evidence of fraud; we held the rejection efficacious. That portion of *Hicks* which dealt with the issue whether the policy was a "renewal," has been overruled. See *Beauchamp v. Southwestern National Insurance Company, supra* note 22.

The parties to this appeal, as this court did in *Hicks,* refer to the Pennsylvania case, *Johnson v. Concord Mutual Insurance Co., supra* note 27, for the applicability of waiver to UMC rejections. We find *Johnson* inapposite here. There, the insured sought *reformation* of his policy. The action was hence grounded on contract principles rather than on a breach of some statutory duty. We note also that the statute under scrutiny in that case has been amended. In Pennsylvania owners of automobiles for private use no longer have the right to reject UMC; that right is limited to owners and operators of commercial vehicles. See *Johnson v. Concord Mutual Insurance Co., supra* note 27 at 64, n. 4.

**32.** See, e.g., *Moser v. Liberty Mutual Insurance Company, supra* note 10 at 410 n. 16; *Uptegraft v. Home Ins. Co.,* Okl., 662 P.2d 681, 683 [1983]; *Keel v. MFA Insurance Company,* Okl., 553 P.2d 153, 155 [1976].

pel do not afford a gauge for measuring the efficacy of a UM rejection.[33] Like other jurisdictions before us, we refuse today to impose supra-statutory duties upon insurers by judicial fiat.[34]

COURT OF APPEALS' OPINION VACATED; TRIAL COURT'S SUMMARY JUDGMENT AFFIRMED.

HARGRAVE, V.C.J., and
LAVENDER, SIMMS and SUMMERS, JJ., concur.

KAUGER, J., concurs in result.

WILSON, HODGES and DOOLIN, JJ., dissent.

ALMA WILSON, Justice, dissenting:

The coverage termed "uninsured motorist coverage" is surely one of the most remarkable contractual undertakings ever devised, for uninsured motorist coverage does *not* insure uninsured motorists, (third parties); nor does it insure vehicles; rather, *uninsured motorist coverage affords first-party coverage to person(s)* for whom the insurance contract is being written. It, thus, matches the complexity of the underlying policy and affords benefits on account of a wide variety of losses: medical expense, lost earnings, pain and suffering, including death. In this state, the indemnity language of uninsured motorist coverage, as mandated by 36 O.S. 1981 § 3636 is this:

"The policy ... *shall provide coverage ... for the protection of persons insured* thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicle and hit and run motor vehicles *because of bodily injury, sickness or disease, including death* resulting therefrom...." [*Emphasis added.*]

There has been limited testing of the question how far the offeree must *understand* the terms of the coverage offered in order to decline it effectively. It has been held that the insurance company has no duty to explain uninsured motorist coverage to an insurance applicant *unless the applicant asks for an explanation. Lopez v. Midwest Mutual Ins. Co.,* 223 So.2d 550 (Fla.App.1969). This view comports with the rule in Oklahoma, as set forth in the early case of *All American Bus Lines, Inc. v. Schuster,* 199 Okl. 628, 189 P.2d 412 (1948), as follows:

"Where a party signs a written agreement, *in the absence of false representa-*

**33.** See *Dufresne v. Elite Insurance Company,* 26 Cal.App.3d 916, 103 Cal.Rptr. 347, 353 [1972].

**34.** See, e.g., *McCloe v. Utah Home Fire Ins. Co.,* 121 Ariz. 402, 590 P.2d 941, 943 [App.1979] (At one time Arizona's UM statute required that uninsured motorist coverage "be called to the attention of the insured." Ariz.Rev.Stat. § 20–259.01 (1970). Both the duty to alert insureds to UMC's availability and the right to reject that coverage have been eliminated and replaced by mandatory *minimal* coverage. See Ariz.Rev.Stat. § 20–259.01 (1986) and *Stuart v. Insurance Co. of North America,* 152 Ariz. 78, 730 P.2d 255, 258 and 260 [App.1986].); *Dufresne v. Elite Insurance Company, supra* note 33 at 353 (Rejection of UMC may be effected only by strict compliance with the specific *statutory* method.); *Georgia Farm Bureau Mut. Ins. Co. v. Drexler,* 254 Ga. 98, 326 S.E.2d 741, 743 [1985] (The court *declined to extend the statutory language* and hence to require that insurer offer UMC to unnamed insureds.); *Dairyland Ins. Co. v. Kelley,* 181 Ga.App. 230, 352 S.E.2d 174, 176 [1987] (Insured was entitled to UMC because rejection statements were not executed according to *explicit statutory* requirements.); *Orolin v. Hartford Acc. & Indem. Co.,* 585 F.Supp. 97, 101 [N.D.Ill.1984] (Insurers are required to sup-

ply no more than minimal information to apprise insureds of UMC's availability and to prompt further inquiry.); *Brady v. Universal Underwriters Ins. Group,* 37 Ohio App.2d 107, 307 N.E.2d 548, 551–552 [1973] (Although the insured denied rejecting UMC and knowing of its availability, he undisputedly signed a rejection statement of his own free will. The rejection was held efficacious; absent a common-law misrepresentation claim, no material issues of fact existed. *Brady* is cited in *Poots v. Motorist Ins. Companies,* 38 Ohio App.3d 48, 526 N.E.2d 71, 73 [App.1986] ); *Geisler v. Mid–Century Insurance Company, supra* note 20 at 186 (Absent an express statutory requirement, the court declined to impose an affirmative duty upon insurers either to offer or to obtain a signed rejection of coverage that exceeds the legislatively mandated minimum.); but see *Patrick v. Cherokee Ins. Co.,* 354 Pa.Super. 427, 512 A.2d 24, 27 [1986]; and *Vasquez v. Bankers Ins. Co.,* 502 So.2d 894, 896 [Fla.1987] (Effective October 1, 1987 a named insured's signature on a statutory form gives rise to a *conclusive presumption* that "there was an informed, knowing rejection." See Fla.Stat.1987 Ch. 627.727(1).).

*tion* or fraud, he is bound by it, although ignorant of its contents." [Emphasis added.]

In the case now before this Court, Randall alleges that he telephoned the agent's office for an explanation of uninsured motorist coverage. He further alleges that it was misrepresented to him that uninsured motorist coverage applies only to property damage caused by an uninsured motorist. He further averred that, relying upon the false explanation given to him, he signed the rejection statement which is the subject of this appeal. When Randall asked for the explanation about uninsured motorist coverage, it devolved upon the insurer to provide a complete and accurate explanation of uninsured motorist coverage, such that Randall would be able to make an intelligent and knowing decision whether to reject the coverage or not. There is always a duty to not state an untrue fact even when there is no duty to speak in the first instance. As stated in *Gidley v. Chapple*, 110 P. 1099 (Okla.1910):

"[A]lthough a party may keep absolute silence and violate no rule of law or equity, yet *if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to discover the whole truth.*" [Emphasis added.]

Moreover, it is the law in Oklahoma that everyone has a duty to not injure or harm another person, and such harm may stem from negligent misrepresentation. *See, e.g., Oklahoma Constitution,* Article II, § 6; 76 O.S. 1981 § 1; 23 O.S.1981 § 3. Further, the insureds here are not precluded from recovery under a theory of constructive fraud because they stood within the Special Relationship of Insured to Insurer.

An insurance policy is *not an ordinary contract.* It is a complex instrument, unilaterally prepared and *seldom understood by the insured.* The parties are not similarly situated. The company and its representatives are expert in the field; the insured is not.... *Allstate Insurance Co. v. Pietrash,* 454 P.2d 106 (Nev. 1969). [Emphasis mine.]

Consequently, this Court has held that contracts of insurance are contracts of adhesion as a result of this uneven bargaining position. *Wilson v. Travelers Insurance Co.,* 605 P.2d 1327 (Okla.1980). This Court has also previously recognized the quasi-public nature of these particular adhesion contracts. In *Christian v. American Home Assurance,* 577 P.2d 899 (Okla. 1978), we stated:

In *Fletcher,* [*v. Western National Life Insurance Co.,* Cal.App.3d 376, 89 Cal. Rptr. 78, 47 A.L.R.3d 286 (1970)], the Court discussed the *special relationship* between an insurer and its insured which gives rise to the duty of good faith and fair dealing. The Court observed that the *industry has a quasi-public nature,* that it *involves the public interest....* The consumer has no bargaining power and no means of protecting himself from the kinds of abuses set forth.... The following discussion of this *special relationship* between an insurance company and its insured, is *relevant here:*

"... To some extent this special relationship and the special duties take cognizance of the great disparity in the economic situations and *bargaining abilities* of the insurer and the insured.... To some extent the special relationship and duties of the insurer exist in recognition of the fact that the insured does not contract ... to obtain a commercial advantage but to protect [himself]." [Emphasis added.]

Similarly, in the case of *Egan v. Mutual of Omaha Insurance Co.,* 620 P.2d 141 (Cal.1979), it is stated:

The insurer's obligations are ... rooted in their status as purveyors of a vital service labelled quasi-public in nature. Suppliers of services *affected with a public interest* must take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements.... [A]s a supplier of a *public service* rather than a manufactured product, the obligations of insurers go beyond meeting reasonable expectations of coverage. The obligations of good faith and fair

dealing encompass qualities of decency and humanity inherent in the *responsibilities of a fiduciary. Insurers hold themselves out as fiduciaries,* and with the public's trust must go private responsibility consonant with that trust.... Furthermore, the relationship of insurer and insured is *inherently unbalanced;* the *adhesive nature* of insurance contracts places the insurer in a *superior bargaining position.*

I am accordingly convinced that a special fiduciary relationship does exist between the insureds and the insurer in this case, and that recovery may be available if the insureds can prove their allegations of constructive fraud and/or negligent misrepresentation.

Under the facts of the present case, even though the acts of the insurer's agent may or may not have been intended to deceive, it is obvious that the false representations were made with intent to induce the Plaintiffs to enter into the contract of waiver of UM benefits. Constructive fraud is defined at 15 O.S.1981 § 59 as:

1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him; or,

2. Any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

Constructive fraud does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose; even an innocent or negligent misrepresentation may constitute "constructive fraud" where there is an underlying right to be correctly informed of the facts.

Additionally, with respect to the issue of constructive fraud, I must also register my disagreement with the majority's conclusion that the technical form of the pleadings in this case preclude consideration of the insured's claim on this basis. The Oklahoma Pleading Code provides:

"Each averment of a pleading shall be simple, concise and direct. *No technical forms of pleadings or motions are re-*

*quired."* 12 O.S.1988 Supp., § 2008(E)(1).

Lawsuits should be determined on their merits and according to the dictates of justice, rather than in terms of whether or not the averments in the paper pleadings have been artfully drawn. This is a fundamental requirement of civil procedure, as evidenced by the mandate of 12 O.S.1988 Supp., § 2008(F):

"All pleadings shall be so construed as to do substantial justice."

The function of pleadings is narrow, i.e., to give "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957). This fundamental criteria has been met in this case. Inasmuch as Randall's claims were sufficiently pleaded and material facts remained in controversy when the trial court granted summary judgment, the trial court erred in granting the insurer's motion for summary judgment at that time. Therefore, this Court should remand this case to the trial court to determine the factual issues raised by Randall's allegations.

I have been authorized to state that HODGES and DOOLIN, JJ., join in this dissent.