**KANSAS MUNICIPAL GAS AGENCY, Plaintiff,**

v.

**VESTA ENERGY COMPANY, INC., Defendant.**

**VESTA ENERGY COMPANY, INC., Third–Party Plaintiff,**

v.

**GASTRAK CORPORATION, Third–Party Defendant.**

**No. 92–2350–JWL.**

United States District Court, D. Kansas.

Feb. 2, 1994.

---

Robert L. Bezek, Jr., James G. Flaherty, Dee Anne Henrichs, Anderson, Byrd, Richeson & Flaherty, Ottawa, KS, for plaintiff KS Mun. Gas Agency.

Kirk T. May, Robert M. Thompson, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for defendant Vesta Energy Co., Inc.

Lee M. Smithyman, David J. Roberts, Smithyman & Zakoura, Chtd., Overland Park, KS, for third-party defendant Gastrak Corp.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

### I. Introduction

This case involves a breach of contract claim arising out of three letter agreements for the sale of natural gas between plaintiff Kansas Municipal Gas Agency ("KMGA") and defendant Vesta Energy Company ("Vesta"). Vesta has also asserted a fraud claim against third-party defendant Gastrak Corporation ("Gastrak"). Because of the amount in controversy and because KMGA is

a Kansas interlocal municipal agency formed by a group of Kansas municipalities pursuant to K.S.A. § 12–2901, *et seq.*, Vesta is an Oklahoma corporation and Gastrak is a Kansas corporation, jurisdiction of the matter rests with this court pursuant to 28 U.S.C. § 1332.[1]

In early 1992, KMGA set out, through its agent, Gastrak, to find a source of natural gas for its member cities. In early April, 1992, letter agreements were entered into between KMGA and Vesta which agreed on the essential terms of a gas supply contract but left certain matters for a final contract. Vesta's abrupt cancellation after several months of supplying gas to KMGA pursuant to the letter agreements while negotiations on a final contract between the parties were ongoing gave rise to this action. KMGA withheld payment for certain gas which had already been delivered and brought this suit for the difference between the cost it incurred in obtaining a substitute source of supply for the balance of the letter agreements' one year term and the prices which it had with Vesta. In response, Vesta counterclaimed for the price of the gas which had been delivered but not paid for, and, for the first time, raised the contention that it only entered into this contract because Gastrak's then president, John Vannatta, had misrepresented to Vesta's Jack Meyer, in a telephone conversation on April 3, 1992, that KMGA had a firm bid from another supplier at a price lower than Vesta's. According to Vesta, it lowered its price and entered into the letter agreements based on what turned out to be a falsehood. As a result, Vesta also counterclaimed for rescission of the letter agreements and brought a third-party action against Gastrak for fraud.[2]

All parties having waived their jury demands, a trial to the court was held in this matter on January 4 through 7 and 11 through 13, 1994.[3] Two principal issues emerged:

1. Whether Vesta terminated the letter agreements in good faith or because it wanted to escape a bad business deal; and

2. Whether John Vannatta lied to Jack Meyer about having a lower price from another supplier.

Based on a careful consideration of all the evidence and the applicable law, the court concludes that Vesta committed breaches of the letter agreements by canceling them in bad faith in order to escape an unfavorable business arrangement and the court is not persuaded that Mr. Vannatta made the alleged misrepresentation. Accordingly, damages are awarded to KMGA in the amount of $904,945.00, plus pre-judgment interest from May 1, 1993 at the rate of 10% per annum and the costs of this action.

## II. Facts

The following findings of fact are entered pursuant to Fed.R.Civ.P. 52. KMGA is a Kansas interlocal municipal agency formed by a group of Kansas municipalities pursuant to K.S.A. § 12–2901, *et seq.* One of KMGA's functions is to acquire a natural gas supply to be used by the municipalities for local distribution and fuel for electric generation. KMGA retained GasTrak as its executive agent to acquire a natural gas supply for the agency and to manage the transportation and

1. The parties are in agreement that Kansas law applies to KMGA's breach of contract claim against Vesta. Additionally, the court has previously determined in our Memorandum and Order dated December 3, 1993 that Oklahoma law applies to Vesta's fraud claim against Gastrak, due to the fact that the alleged fraudulent representation by Gastrak was received by Vesta in Oklahoma. 840 F.Supp. 814.

2. Vesta also asserted a fraud claim against KMGA which was disposed of in the court's December 3, 1993 Memorandum and Order. In apparent response to that fraud claim, KMGA brought one against Vesta based upon information gained in discovery which was also disposed

of in our December 3, 1993 Memorandum and Order.

3. Following the trial, each of the parties submitted deposition designations to the court. Gastrak submitted its designations by means of a motion to offer additional deposition testimony (Doc. # 104). That motion is granted. Additionally, there were several points in the deposition testimony submitted by Vesta to which KMGA objected on hearsay grounds. Vesta has filed a response to those objections in the form of a motion (Doc. # 122). The objections by KMGA are overruled, Vesta's motion is granted and the court has considered that deposition testimony.

accounting matters relating to that gas supply. GasTrak provides professional expertise and services in acquiring gas supplies for customers and also provides administrative and management services relating to transportation and accounting matters after the customer has acquired a gas supply.

On January 31, 1992, GasTrak mailed a request for proposal ("RFP") to approximately forty gas suppliers seeking offers to supply gas to KMGA. The RFP provided KMGA's estimated average daily quantity requirements, monthly quantity requirements and peak day requirements by pipeline. The three pipelines from which KMGA required gas were the Arkla pipeline, the Williams Natural Gas Company ("WNG") pipeline and the Kansas Power and Light Company ("KPL") pipeline. The RFP provided various pricing provisions that would be acceptable, including a fixed price for a twelve month period, a fixed price on a seasonal basis for the six month period from May, 1992 through October, 1992 and for the six month period from November, 1992 through April, 1993, and a monthly price tied to a specified published index. The RFP also requested that bidders include a description of how peaking requirements would be met, as well as the price basis that would be involved if peaking prices differed from the prices quoted for the monthly gas requirements. The RFP further provided that all of the nominated volumes should be supplied on a firm supply basis. A specimen contract was provided with the RFP and bidders were instructed to designate any exceptions to the proposed contract terms.

On February 14, 1992, in response to the RFP, Vesta provided GasTrak with a proposal to serve KMGA's gas requirements beginning May 1, 1992. Vesta proposed to provide one hundred percent of KMGA's gas requirements for the Arkla, WNG and KPL pipelines. Vesta provided a flat price, winter/summer price and an index price on each of the three pipelines for a term of one year beginning May 1, 1992 and ending April 30, 1993. In its response, Vesta did not indicate that there would be any difference in price for gas during peaking periods. Additional-

ly, Vesta did not designate any exceptions to the terms contained in the specimen contract.

KMGA received responses to its RFP from approximately 15 suppliers of natural gas. Several meetings of the executive board of KMGA were held during the month of March at which the various responses were reviewed. Following these meetings, KMGA officials set up separate meetings with Vesta and Mobil officials on April 1, 1992. During this period, it appears that Mobil was the top choice of KMGA and Gastrak officials due to its status as a major producer and the belief that it could provide a more reliable supply of gas than a marketing company, such as Vesta.

The meetings with Vesta and Mobil officials took place at Gastrak's offices in Overland Park on April 1, 1992. Neither Vesta nor Mobil were aware that KMGA had set up a meeting with the other supplier. The meeting with Vesta occurred in the morning. The meeting was attended by KMGA/GasTrak representatives Debi Roberson, John Vannatta, Joan Schnepp, Robert Walker and Bob Mills. At the meeting, Vesta representatives Jack Meyer and Keith Kelly presented a brief background of Vesta's history and also made a presentation regarding the benefits that would inure to KMGA through Vesta's transportation service. At this point in the meeting the Vesta representatives were informed that KMGA intended Gastrak to handle the transportation of the natural gas on the various pipelines, and Mr. Kelly and Mr. Meyer were asked whether the fact that Vesta would not be required to handle transportation services would affect the price of their gas. Mr. Meyer confirmed that it would have an impact and Mr. Meyer and Mr. Kelly retired to a different room to discuss the impact of this information on their bid. When they returned, they informed the KMGA/Gastrak representatives that because Vesta would not be responsible for transportation services, Vesta could reduce its index price bid on the ARKLA pipeline from index plus 2% to index plus 2 cents and they could reduce their index price bid on the Williams pipeline from index plus 5 cents to index plus 2 cents. They also informed the KMGA/Gastrak representatives

that the fact that Vesta would not be responsible for transportation services would affect their annual and seasonal rate bids but in order to calculate the revised price they would need to run information through a computer spread sheet analysis on their computers at their office in Tulsa.

The meeting between KMGA/Gastrak and Mobil representatives took place that afternoon. Following a background presentation on the company, the Mobil representative informed KMGA/Gastrak officials that Mobil was raising its prices for gas from those contained in its response to the RFP. In defending its ability to raise its prices, the Mobil representative noted that the RFP contained a provision that bids would remain valid for a period of thirty days, and that the thirty day period had expired. KMGA/Gastrak officials were upset that Mobil had elected to revise its prices, and at the close of the meeting they asked the Mobil representative to take their request to reconsider the price change back to Mobil management.

Following the April 1 meeting, negotiations between GasTrak and Vesta commenced which resulted in the execution of three letter agreements whereby Vesta agreed to begin supplying gas to KMGA at agreed upon prices from the Arkla, WNG and KPL pipelines (the "letter agreements"). As discussed further below, the court was not persuaded at trial that Mr. Vannatta made any misrepresentation to Mr. Meyer in the course of these discussions and finds that the parties entered into these agreements with the mutual intention to fulfill KMGA's needs for a firm supply of gas at a price then satisfactory to both parties.

The letter agreements in question were for one year terms, contained set price terms for summer and winter gas, and specified the delivery point for the gas (which corresponded to the respective pipelines). Each of the letter agreements contained a provision which read that "Vesta warrants these volumes at the agreed to price except under generally accepted conditions of Force Majeure." [4] Additionally, each of the letter agreements contained the following language:

> This Letter Agreement shall remain valid until the execution of a mutually agreeable contract. Should Buyer and Seller fail to reach a mutually agreeable contract, this Letter Agreement shall become null and void.

Following the execution of the letter agreements, the parties entered into negotiations on a finalized written contract. On April 9, 1992, Vesta provided KMGA/GasTrak with a proposed contract based on the specimen contract contained in the original RFP with revisions. Over the next several months, the parties exchanged several draft contracts and had numerous telephone contacts in an attempt to arrive at a mutually agreeable contract. Several issues remained unresolved, including Vesta's demand for assurances that supplied gas was going only to KMGA member cities, pricing language for peak volumes during times of curtailment, creditworthiness provisions, and force majeure language.

On July 20, 1992, Vesta sent a memo to KMGA/GasTrak outlining their concerns. On August 4, 1992, the parties had a meeting in an attempt to work out their differences. KMGA contends that virtually all remaining points of contention were resolved at this meeting and all that remained was to prepare a formal contract memorializing the parties' agreement. On August 17, 1992, KMGA/GasTrak prepared yet another draft contract and sent it to Vesta. However, on September 8, 1992, Vesta sent a letter to KMGA declaring the letter agreements null and void due to the parties' failure to reach agreement on a mutually acceptable contract.

The court is persuaded that Vesta terminated the agreement because it was a bad business deal and it could not extricate itself otherwise. Its stated reasons for terminating were pretextual. The evidence on which

---

**4.** There was no provision in the letter agreements specifying the volume of gas to be provided. However, in its original response to the RFP, Vesta proposed to supply "100% of KMGA's gas requirements." That is the basis on which the parties' discussions proceeded. The court finds that it was the mutual intention of the parties that Vesta would provide one hundred percent of KMGA's gas requirements.

the court relies in arriving at this conclusion is best understood in the context of Vesta's demand for a force majeure clause in the final contract that was not limited to conditions generally accepted in the natural gas supply business, but rather one which would have provided it with a way out of the contract in the event of a broadly defined "loss of supply."

The RFP sent out by KMGA specifically set forth that KMGA was seeking a "firm supply" of gas. Having a firm supply of gas was of the utmost importance to KMGA. This is due to the fact that its members cities use the gas for residential heating and cooling, and an interruption of gas supply would have a traumatic effect on the member cities. It made this point clear to Vesta and the court has no difficulty finding as a matter of fact that the mutual intention of the parties was that the letter agreements were for a firm supply. Within the natural gas industry, "firm supply" generally means that the supplier guarantees that it will meet its supply requirements. This is typically done by providing specific well dedications in the case of a producer or, in the case of a marketer such as Vesta, by warranting that it has gas supply in sufficient quantities to meet its obligations under a gas supply contract. In contrast, a "best efforts" arrangement requires that a gas supplier use its "best efforts" to supply gas, but typically imposes no penalty for a failure to do so. A firm supply contract creates a much greater commitment on the part of a supplier to supply gas than does a best efforts contract.

Although a firm supply contract puts a great onus on the supplier to deliver the specified quantity of gas, firm supply contracts typically contain a provision limiting the supplier's obligation in cases of "force majeure." A contractual force majeure provision provides that a supplier is not obligated to supply gas when certain events, beyond the control of a supplier, make such supply impossible. Typical force majeure events in a gas supply contract consist of various events that are beyond the supplier's control, including, among other things, such conditions as acts of God, strikes, lockouts, wars, blockades, government regulatory intervention, explosions, sabotage, freezeup and line collapse. As one of its reasons for canceling the letter agreements, Vesta points to the failure of KMGA to agree to force majeure language in the contract to the effect that Vesta would not be obligated to produce gas in cases of "failure of supply." The court finds that this broad loss of supply provision demanded by Vesta is totally contradictory to the notion of a firm supply contract, and the court relies on the testimony of expert witness William Giese that such a provision would not be generally accepted force majeure language in a firm supply contract.

The situation that arose with Vesta's supplier Seagull Marketing Services, Inc. ("Seagull"), illustrates why the broad force majeure clause proposed by Vesta was totally inconsistent with a firm supply of gas. Following the execution of the letter agreements, Vesta took two steps to meet its supply obligations to KMGA and to protect against a price increase. Vesta entered into a deal with Seagull whereby Seagull would supply gas to Vesta at a price roughly equivalent to the price that Vesta was charging KMGA.[5] This supply would cover a large portion of the KMGA requirements. However, Vesta did not have a firm supply contract with Seagull, and the Seagull gas was also subject to recall by the WNG pipeline. Vesta planned to meet the remaining KMGA requirements by purchasing gas from its net-back pool.[6]

During the summer of 1992, natural gas prices soared in a manner that was uncommon for the industry and against the historical norm of the preceding several years. Typically, natural gas prices had peaked in the month of February and then declined

---

5. The Seagull gas was priced slightly higher than the KMGA sales price during the summer months and slightly lower than the KMGA sales price during the winter months. The court concludes that Vesta believed it could make a profit on the sale of the Seagull supplied gas to KMGA over the one year period of the contract.

6. Vesta's net-back pool consisted of a group of suppliers who supplied gas to Vesta on a best efforts basis, at a price equivalent to 98% of Vesta's selling price to the end user.

during the summer months. However, due to a combination of factors, natural gas prices escalated during 1992 from a low of approximately $1.00 per MMBtu in February of 1992 to a September 1992 price of $1.92 on the Arkla pipeline and $1.78 on the Williams pipeline. Thus, as gas prices rose during the summer of 1992, the KMGA contract became an increasingly bad deal for Vesta. The KMGA contract was also having a negative effect on the price Vesta would be able to pay its suppliers in its net-back pool. Because the KMGA sales price was so far below market, Vesta's net-back pool price was approximately ten cents below market prior to its cancellation of the KMGA contract, and was projected to go lower. This low net-back price was potentially very harmful to Vesta because it faced the possibility that its net-back suppliers would go elsewhere, leaving Vesta with insufficient gas supply to meet its obligations.

Already burdened with the increasingly bad economics of the KMGA deal and its effect on Vesta's net-back pool price, Vesta received another blow when Seagull canceled delivery of gas to Vesta in early September, 1992. Vesta had now lost its only fixed supply of gas with a price based on the KMGA contract price. It is unclear from the evidence the precise reason Seagull canceled deliveries to Vesta, but it is clear that Vesta's contract with Seagull was only a best efforts contract and that the Seagull gas was subject to recall by the WNG pipeline. Vesta sent its cancellation letter to KMGA only days after Seagull discontinued supplying gas to Vesta.

It is apparent from the testimony of Vesta representative Meyer that Vesta intended that the broad force majeure "failure of supply" language they desired in the final KMGA written contract would cover a situation such as arose with Seagull, where one of Vesta's suppliers cut off their supply to Vesta. Vesta intended the exception to apply not only to loss of a supplier in a generally accepted force majeure situation, but to loss of a supplier for any reason, including economic reasons. Having a supply of gas available through firm contracts with suppliers such as Seagull for adequate volumes to meet KMGA's needs is not something beyond Vesta's control in the way that freezeups, line collapses, acts of god or other generally accepted force majeure events would be. In fact, such a provision would effectively reduce Vesta's obligation to supply gas on a firm supply basis to a best efforts basis.

Following Vesta's cancellation of the letter agreements, KMGA was forced to purchase gas from another supplier at a price higher than that provided for in the letter agreements. KMGA eventually paid $1,546,695 more to obtain gas from its substitute supplier than it would have paid to Vesta had Vesta delivered the nominated gas volumes in the RFP at the prices set forth in the letter agreements. Additionally, following Vesta's cancellation of the letter agreements, KMGA withheld $641,750 for gas previously delivered by Vesta.

## III. Discussion and Conclusions of Law

### A. KMGA's Breach of Contract Claim

■ The pivotal question regarding KMGA's breach of contract claim is whether the parties' failure to reach a mutually agreeable "final written contract" was due to Vesta breaching its obligation of good faith and fair dealing under the letter agreements. In our Memorandum and Order dated December 3, 1993, the court concluded that the letter agreements are governed by the Kansas Uniform Commercial Code, K.S.A. § 84–1–101, *et seq.* Natural gas is covered by the definition of "goods" contained in K.S.A. § 84–2–105. There can be no doubt that, at the time of the execution of the letter agreements, the parties fully intended that performance under the letter agreements included attempting to arrive at a mutually agreeable final written contract governing the gas purchase. The parties were therefore obligated under K.S.A. § 84–1–203 to conduct themselves in good faith in endeavoring to negotiate and finalize the final written contract.[7] Because the parties fit the UCC definition of mer-

7. K.S.A. § 84–1–203 provides that "[e]very contract or duty within this act imposes an obligation of good faith in its performance or enforcement."

chants contained in K.S.A. § 84–2–104(1),[8] the duty of good faith applicable here is defined in K.S.A. § 84–2–103(b).[9]

■ As detailed in our findings of fact, the court has determined that Vesta's demand for a broad "failure of supply" provision in the force majeure section of the contract was totally contradictory to the notion of a firm supply contract and that such a provision would not be generally accepted language in a firm supply contract. Consequently, the court finds that Vesta's insistence on such a broad force majeure provision was not consistent with "the observance of reasonable commercial standards of fair dealing in the trade," as required by K.S.A. 84–2–103(b) and therefore was not a valid justification for Vesta's termination of the letter agreements.

■ In addition to our finding that Vesta's insistence on the broad "failure of supply" force majeure provision was not commercially reasonable, the court also finds that the other reasons enumerated by Vesta for canceling the letter agreements in its September 8, 1992 letter were pretextual. Vesta's assertion that additional participants had been added to the initial group of municipalities and that its bid was based solely on particular municipalities being involved does not square with the facts. The RFP and Vesta's response dealt solely with nominated volumes and made no mention of who the participant municipalities were. Furthermore, it was admitted by Vesta at trial that its assertion that requested nominations exceeded the RFP in some cases by 180% was based on its own erroneous calculations. Finally, the court credits the testimony of KMGA/Gastrak representatives that the remaining issues detailed in Vesta's letter were resolved at the

August 4, 1992 meeting between Vesta and KMGA/Gastrak representatives, subject to the respective legal staffs working out relatively simple agreeable language on several provisions that had been agreed to in principle. Thus, the court concludes that Vesta was not "honest in fact" in purporting to rely on those grounds for termination.

■ Following Vesta's breach of the letter agreements, KMGA proceeded to purchase substitute gas from another supplier. Pursuant to K.S.A. § 84–2–712(1), following a breach by a seller the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those from the seller. The buyer is then entitled to recover from the seller as damages the difference between the cost of cover and the contract price. K.S.A. § 84–2–712(2). The court finds that KMGA's purchase of substitute gas was made in good faith and without unreasonable delay[10], and that its cost to cover amounted to $1,546,-695.00. In arriving at KMGA's final damage total, the cover price is reduced by $641,-750.00, which represents payment withheld by KMGA pursuant to K.S.A. § 84–2–717 for gas that was previously delivered by Vesta. The court therefore finds KMGA's damages resulting from Vesta's breach to be $904,-945.00.[11]

### B. Vesta's Fraud Claim

Vesta's fraud claim against Gastrak and recision defense to KMGA's breach of contract claim stems from alleged statements made by John Vannatta, president of Gastrak, during an April 3, 1992 telephone call to

---

8. K.S.A. § 84–2–104(1) defines a merchant as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

9. K.S.A. § 84–2–103(b) provides that "good faith in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

10. Vesta has never contested this particular point.

11. The court finds that KMGA's damages were ascertainable as of May 1, 1993, which was the day after Vesta's obligation to provide gas pursuant to the letter agreements expired. KMGA is therefore entitled to pre-judgment interest at the rate of 10% per annum as of that date. *See Royal College Shop v. Northern Ins. Co. of N.Y.*, 895 F.2d 670 (10th Cir.1990); *Phelps Dodge Copper Products Corp. v. Alpha Construction Co.*, 203 Kan. 591, 455 P.2d 555 (1969); K.S.A. § 16–201.

Jack Meyer at Vesta. Vesta contends that during that phone call Mr. Vannatta told Mr. Meyer that KMGA falsely represented that KMGA had a firm offer to supply natural gas from Mobil, but that Vesta could have the deal if they could match Mobil's price. Vesta contends that Mr. Vannatta quoted the Mobil price that had in fact been rescinded at the meeting with the Mobil representative on April 1, 1993. Vesta contends that it relied on this false statement in lowering its bid to the amount that was eventually accepted by KMGA and incorporated into the letter agreements. Indeed, Vesta contends that it would never have entered into the letter agreements at those prices had it known Mobil's bid had been rescinded.

█ To establish a fraud claim under Oklahoma law a plaintiff must show by clear and convincing evidence that: (1) the defendant made a false, material representation; (2) that defendant knew it was false when it was made: (3) that it was made with intent that plaintiff act on it; and (4) that plaintiff relied on such representation and suffered detriment. *See Citizens Bank & Trust Co. of Vivian, Louisiana v. Tomlin,* 852 P.2d 803 (Okla.App.1993); *Silver v. Slusher,* 770 P.2d 878, 881 (Okla.1988).

█ The court finds that Vesta has failed to establish its fraud claim. As would be expected, the direct evidence, consisting of the testimony of Mr. Vannatta and Mr. Meyer, is entirely contradictory. However, the court finds Mr. Vannatta to have been the more credible witness and that his version is better supported by the circumstantial evidence.

The revised Vesta prices that were incorporated into the letter agreements were entirely consistent with Vesta lowering its prices to compensate for the savings it would incur by not having to provide transportation services for the supplied gas. The KMGA/Gastrak representatives at the April 1, 1993 meeting all testified that the meeting concluded with an understanding that once the Vesta representatives had access to their

computer programs Vesta would provide KMGA with refigured seasonal pricing reflecting the fact that Vesta would not be providing transportation services for the supplied gas.[12] Additionally, Mr. Tudor of Vesta testified that he received a report following the April 1, 1993 meeting that Vesta was modifying its bid to reflect transportation costs. The KMGA/Gastrak representatives are also unanimous in their recollection that concerns were expressed to Vesta regarding the ten cent differential on winter pricing between the WNG pipeline and Arkla pipeline because KMGA wanted to provide a uniform price to its member cities. The revised Vesta prices that were incorporated into the letter agreements are consistent with the reduced transportation costs and pricing disparity which were addressed at the April 1, 1993 meeting. All told, the court simply is not persuaded that matters transpired as Vesta contends.

## III. Conclusion

After careful consideration of the facts and law, the court finds that Vesta violated its duty of good faith under the UCC in canceling the letter agreements, with the result that the cancellation constituted breaches of the contracts. Therefore, the court finds that KMGA is entitled to damages in the amount of $904,945.00, plus interest, both pre-judgment and post-judgment, and the costs of this action.

The court further finds that Vesta has failed to establish its fraud claim and its request for relief is denied.

**IT IS, THEREFORE, BY THE COURT ORDERED THAT** KMGA's claim for breach of contract is granted, and judgment is entered in favor of KMGA in the amount of $904,945.00, plus pre-judgment interest from May 1, 1993 at the rate of 10% per annum and the costs of this action.

**IT IS FURTHER ORDERED THAT** judgment is ordered against Vesta on its declaratory judgment and rescission de-

---

**12.** In fact, Vesta amended its index prices at the meeting to reflect the reduced transportation costs.

mands against KMGA and on its fraud claim against Gastrak.

**IT IS SO ORDERED.**